804 A.2d 1178 (2002)
354 N.J. Super. 146
ASBURY PARK PRESS, Plaintiff,
v.
LAKEWOOD TOWNSHIP POLICE DEPARTMENT, Chief Michael Lynch, In His Official Capacity As Chief Of The Lakewood Police Department; Ocean County Prosecutor's Office, E. David Millard, In His Official Capacity As The Ocean County Prosecutor, Defendants, and
Steven Kelusak, Christopher Spagnuolo, Joseph Qualiano, III, Defendants-Intervenors, and
The State of New Jersey by the Attorney General, John J. Farmer, Jr.; the New Jersey Press Association; the Society of Professional Journalists; the Reporters Committee for Freedom of the Press, Amici Curiae.
Superior Court of New Jersey, Law Division, Ocean County.
April 2, 2002.
*1181 John C. Connell, Haddonfield, for plaintiff (Archer & Greiner, Attorneys).
Kevin B. Riordan, Toms River, for defendant Ocean County Prosecutor's Office (Berry, Sahradnik, Riordan, Kotzas & Benson, Attorneys).
Steven Secare, Toms River, for defendant Lakewood Township Police Department (Russo, Secare, Ford, Delanoy & Martino, Attorneys).
Charles Uliano, West Long Branch, for Steven Kelusak (Chamlin, Rosen, Uliano & Witherington, Attorneys).
Edward C. Bertucio, Jr., Eatontown, for Christopher Spagnuolo (Hobbie, Corrigan, Bertucio & Tashjy, Attorneys).
Eric J. Marcy, Woodbridge, for Joseph Qualiano, III (Wilentz, Goldman & Spitzer, Attorneys).
Thomas J. Cafferty and Arlene M. Turinchak, Somerset, for Amici Curiae The New Jersey Press Association, The Society of Professional Journalism, The Reporters Committee (McGimpsey & Cafferty, Attorneys).
Michael J. Williams, Trenton, for Amicus Curiae the State of New Jersey by the Attorney General. *1179
*1180 SERPENTELLI, A.J.S.C.
In this action in Lieu of Prerogative Writs, the Asbury Park Press (hereinafter "Press" or "plaintiff") seeks to compel the Lakewood Township Police Department, its Chief, Michael Lynch, the Ocean County Prosecutor's Office and its former Prosecutor, E. David Millard (hereinafter collectively referred to as "defendants," unless specifically noted)[1] to release a copy of 9-1-1 (hereinafter 911)[2] tapes and police reports relating to a confrontation between Lakewood Township police officers and Thomas Jacobs (hereinafter "Jacobs").
Jacobs, while driving through Lakewood Township on July 6, 2001, was pursued and detained by undercover Lakewood police officers. During the low speed chase, Jacobs allegedly believed he was being followed by "kids in a van," and feared for his safety. He used his cellular phone to call 911 for assistance. Ultimately, Jacobs was stopped and forcibly removed from his vehicle. According to Jacobs, he was thrown to the ground, kicked and punched. After the incident was reported to the Ocean *1182 County Prosecutor's Office, an investigation ensued which led to a presentation to a Grand Jury. Lakewood Police Officers Steven Kelusak, Christopher Spagnuolo, and Joseph Qualiano, III were indicted.
On August 31, 2001, the Press filed this action seeking release of the 911 tapes and police reports regarding the July 6th incident. Subsequently, The New Jersey Press Association, The Society of Professional Journalists and The Reporters Committee for Freedom of the Press (collectively referred to in their pleadings and here as the "Media") and the Attorney General of New Jersey were granted intervention as amici curiae. Thereafter, on November 16, 2001, the three police officers were intervened as defendants.
The Press contends that it is entitled to the tapes and reports both under the statutory Right to Know Law, N.J.S.A. 47:1A-1 et seq., and common law right to know principles. The defendants reluctantly acknowledged that the 911 tapes may be public records pursuant to the statutory Right to Know Law but insist that their release is exempted pursuant to Executive Order No. 69. As to the police reports, defendants contend that they are not statutory records and also cannot be obtained under the common law because they are part of an ongoing investigation and because disclosure would prejudice the rights of the parties in the pending criminal proceedings.
The underlying principles regarding the statutory and common law right to know are well established. The Right to Know Law defines "public records" as:
... all records which are required by law to be made, maintained or kept on file by any board, body, agency department, commission or official of the State or any political subdivision thereof... [N.J.S.A. 47:1A-2.]
Except for those documents that are exempted from disclosure under the Right to Know Law, every citizen of the State is entitled to inspect and copy any document included within the statutory definition of a "public record." Clearly, the records involved in this case are made, maintained or kept either by the Township or the County. The critical question to which the court will return, is whether the 911 tapes and police reports are records under the statute which are "required by law to be made, maintained or kept on file."
If plaintiff is not able to direct the court to any requirement that the tapes or reports be maintained, or if they are exempted from disclosure under the Right to Know Law, the court must focus on plaintiff's claim founded on the common law right to know. The common law definition of a public record is broader than that contained in the Right to Know Law. A public record under the common law is:
... one required by law to be kept, or necessary to be kept in the discharge of a duty imposed by law, or directed by law to serve as a memorial and evidence of something written, said, or done, or a written memorial made by a public officer authorized to perform that function, or a writing filed in a public office. The elements essential to constitute a public record are ... that it be a written memorial, that it be made by a public officer, and that the officer be authorized by law to make it; ... [Josefowicz v. Porter, 32 N.J.Super. 585, 591, 108 A.2d 865 (App.Div.1954) (quoting 76 C.J.S., Records, § 1, p. 112).]
Whether the records are obtainable under statutory law or under common law *1183 has a substantial impact on the relief which is afforded. The Right to Know Law gives a citizen, without showing a personal or particular interest, an unqualified right to inspect public documents if they are, in fact, documents required by law to be made, maintained or kept on file, unless they are exempted pursuant to the Right To Know Law. N.J.S.A. 47:1A-1 et seq.; Techniscan Corp. v. Passaic Valley Water, 113 N.J. 233, 236, 549 A.2d 1249 (1988).
By contrast, under the common law, a citizen's right to examine public documents rests upon a showing of some personal or particular interest in the material sought. Irval Realty, Inc. v. Board of Pub. Util. Comm'rs, 61 N.J. 366, 372, 294 A.2d 425 (1972). Furthermore, even the existence of such an interest does not translate into an absolute right to obtain the documents. Rather, the court must engage in a balancing test to determine whether the individual's right to the information outweighs the public's interest in the confidentiality of the material. Nero v. Hyland, 76 N.J. 213, 223, 386 A.2d 846 (1978).
The balancing process must be concretely centered upon the relative interests of the parties in relation to the specific information sought. McClain v. College Hosp., 99 N.J. 346, 361, 492 A.2d 991 (1985). The process should be "flexible and adaptable to different circumstances and sensitive to the fact that the requirements of confidentiality are greater in some situations than in others." Id. at 362, 492 A.2d 991.
Our Supreme Court has noted that most cases concerning a citizen's right to inspect documents have arisen in the context of a private need. Loigman v. Kimmelman, 102 N.J. 98, 104, 505 A.2d 958 (1986). In Loigman, the Court said that "[s]omewhat different but related considerations arise when the citizen seeks access to information to further a public good." Ibid. Plaintiff alleges that those considerations are present in this case.
Loigman summarized the basic principles applicable to a request for disclosure of documents based upon a claim that the public would benefit. It held that, ordinarily, only an assertion of citizen status is necessary for the production of common law records, subject to a showing of good faith. Ibid. When the governmental need in confidentiality is slight or nonexistent, citizen status will generally warrant disclosure. Id. at 105, 505 A.2d 958 (citing Taxpayers Ass'n of Cape May v. City of Cape May, 2 N.J.Super. 27, 31, 64 A.2d 453 (App.Div.1949)). However, when the interest in confidentiality is great, the right of access must be qualified. In those circumstances, more than citizen status and good faith are necessary to require production of documents. Loigman stressed that a clear showing of a public need does not exist merely because it is claimed that there may be something corrupt which should be exposed for public benefit. The court must be mindful of any negative effect that disclosure may have upon the public good. Id. at 108, 505 A.2d 958. Therefore, determining the appropriate balance between public and private interests calls for an "exquisite weighing process by the trial judge." Beck v. Bluestein, 194 N.J.Super. 247, 263, 476 A.2d 842 (App.Div.1984). A judge must be convinced that disclosing the record will advance a public interest.
In evaluating the claim to examine the records, the courts are instructed by *1184 the guidelines suggested in Loigman, 102 N.J. at 112-113, 505 A.2d 958. In the balancing process the court should consider:
(1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decision making will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials. [Id. at 113, 505 A.2d 958.]
With these tenets in mind, the court turns to an evaluation of the relief sought by the plaintiff. The two categories of records will be considered separately.

I. The 911 Tapes
The plaintiff contends that the tapes made of Jacobs' cellular phone communications, which were logged through the Public Safety Answering Point operated by Ocean County, are records obtainable under both the statutory and common law right to know. They note that the New Jersey Administrative Code requires each Public Safety Answering Point to maintain "[r]ecordings produced by the logging recorder and all documents or records related to 9-1-1 calls in a secured area for no less than 31 days;..." N.J.A.C. 17:24-2.4(a)(1). Therefore, the tapes fit the statutory definition of a document required by law to be made, maintained or kept on file. N.J.S.A. 47:1A-2.[3]
The defendants counter claiming that, even if the tapes could be considered public records under the Right to Know Law, they are exempted from disclosure by an executive order adopted pursuant to N.J.S.A. 47:1A-2 and also because they constitute a record pertaining to an investigation in progress, which is exempted from disclosure by N.J.S.A. 47:1A-3.
Executive Order No. 69 (1997) clarifies Executive Order No. 9 (1963), which excludes from the definition of a public record, "fingerprint cards, plates and photographs and similar criminal investigation records that are required to be made, maintained or kept by any State or local governmental agency." Executive Order No. 69, 29 N.J. Reg. 2729(a) (1997). However, the Order does not constitute a defense to the plaintiff's claim in this case. First, on its face, the exclusion of "fingerprint cards, plates and photographs and similar criminal investigation records" (emphasis added), could not reasonably be read to contemplate 911 tapes. Furthermore, it cannot be said that the tapes are produced for investigation purposes in the same sense as the other documents listed in the Executive Order. They are made because they are required by law to be made and maintained and they are generally made at a *1185 time when no investigation has commenced. Subsequently, they might become part of the investigation process, but they can be distinguished from those documents exempted in Executive Order 69 both by a common sense reading of the Order and because of the reason for which they are made. Cf. State ex rel. Cincinnati Enquirer v. Hamilton Cty., 75 Ohio St.3d 374, 662 N.E.2d 334 (1996).
Parenthetically, it should be noted that the 911 tapes do contain information which fits into a list of items that Executive Order 69 requires to be disclosed. The Order directs that "information of the circumstances immediately surrounding [an] arrest" shall be made available to the public within 24 hours of a request for such information. Executive Order 69, 29 N.J. Reg. 2729(a)(1997). The Order delineates items that should be released, "including but not limited to the time and place of the arrest, resistance, if any, pursuit, possession and nature and use of weapons and ammunition by the suspect and by the police; ..." Ibid. The court has listened to the tapes in camera. They relate, at least, to the circumstances surrounding the arrest including the time, place and pursuit. Indeed, the Prosecutor acknowledged publicly that this case involves a pursuit, as well as allegations of resistance and the presence of a weapon. Press Release, August 21, 2001.
Finally, it should be acknowledged that the Appellate Division has cautioned that the executive orders adopted pursuant to the Right to Know Law cannot be read, without more specific language, to provide an exception to the disclosure requirements of the Act due to the "clear `public policy'" embodied in N.J.S.A. 47:1A-1. Shuttleworth v. City of Camden, 258 N.J.Super. 573, 592, 610 A.2d 903 (App.Div.1992).
Thus, the court concludes that the tapes are documents required to be maintained under the Right to Know Law which are not exempted from disclosure under Executive Order 69. As noted, however, the defendants contend that the tapes should be shielded by virtue of the provisions of N.J.S.A. 47:1A-3 because they "pertain to an investigation in progress" and their release would be "inimical to the public interest." It should be emphasized that the statutory requirements are conjunctive. In order to find a basis to deny access to the tapes, the court must find both that they pertain to an investigation in progress and that their release would be inimical to the public interest.
The Attorney General argues that State v. Frankel, 341 N.J.Super. 594, 602, 775 A.2d 665 (App.Div.2001), stands for the proposition that release of the 911 tapes before the pending criminal proceedings have been resolved will likely have a "chilling" effect on those seeking public assistance from law enforcement authorities. In Frankel, a 911 call was received but no one seemed to be on the line. Id. at 597, 775 A.2d 665. The police responded to the address shown on the dispatcher's computer and found the defendant. He denied making the call but he acted suspiciously and refused to allow the police to enter the residence. Other unusual circumstances ultimately lead to a warrantless search during which the police found marijuana. The defendant moved to suppress. Disclosure of the 911 tape was not at all at issue in the court's decision. Instead, the Court discussed the need for prompt police action in response to 911 calls, even if they are open-line calls. Id. at 602, 775 A.2d 665. In that setting, it found the 911 call provided part of the basis to invoke the so-called emergency aid doctrine which, in turn, justified a warrantless search under the circumstances.
*1186 The Attorney General also argues that Bowling v. Brandenburg, 37 S.W.3d 785, 788 (Ky.Ct.App.2000), supports its claim that the release of the tapes will have a chilling effect. The Kentucky Open Records Act contains a provision which exempts from disclosure a record containing "information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy." KRS 61.878(a). The release of the tape was requested by the appellant, who had allegedly made a threat to kill his wife and other family members. A family member called 911 to report the threat. The court in Bowling found that the request for the tape was made for the specific purpose of determining the identity of the caller, which was "precisely why the Act exempts calls of a personal nature... to prevent the disclosure of a 911 caller's identity." Bowling, 37 S.W.3d at 788. There is no comparable exemption in New Jersey's Right to Know Law. Even if there were such a provision, the identity of the caller in this case has been made known both by the Prosecutor and the media.
The Kentucky Court of Appeals made its ruling in the context of a domestic violence action and only after engaging in a weighing process which balanced the competing interests of the 911 caller's right to privacy when seeking public assistance against the public's right to know about the conduct of public agencies. The Court said, "[r]eleasing the tapes of 911 calls seeking police assistance, particularly in instances of domestic violence, would have a chilling effect on those who might otherwise seek assistance because they would become subject to, as the trial judge in this case noted, retaliation, harassment, or public ridicule." Ibid. That potential is not nearly as significant in the setting of this case. Jacobs, the alleged victim, could hardly be concerned about the future consequences of his call, when his primary motive was to protect himself from the "kids in a van." Fear of retaliation or retribution is not a significant factor in this case.
Finally, unlike our New Jersey law, the Kentucky statute apparently did not have the two-prong requirement that the documents pertain to a criminal investigation and that their release be inimical to the public interest. The Kentucky Court considered only its equivalent of the second prong.
Defendants' arguments for the suppression of the 911 tapes are not supported by any New Jersey precedent. This case is one of first impression in our State. However, other jurisdictions not having the "personal privacy" exception contained in the Kentucky law have directed release of 911 tapes.
The Ohio Supreme Court ruled that 911 tapes are public records that are not exempt from disclosure. State ex rel. Cincinnati Enquirer v. Hamilton Cty., 75 Ohio St.3d 374, 662 N.E.2d 334 (1996). Speaking specifically to 911 tapes that become part of criminal investigations but encompassing all 911 tapes, the Court concluded that once a 911 call is made, it becomes a public record. Id. at 378, 662 N.E.2d 334. The Court found that the 911 tapes were obviously not "confidential law enforcement investigatory records" or "trial preparation records." Ibid. To the contrary, the Court stated that 911 calls are not made for any investigative purposes. Ibid. Furthermore, the Court asserted that, even if the tapes subsequently came into the control or possession of a prosecutor, law enforcement official or even a grand jury, they still had to be disclosed. *1187 Ibid. The Court held that "[o]nce clothed with the public records cloak, the records cannot be defrocked of their status." Ibid. Other jurisdictions have reached the same result. State v. Gray, 741 S.W.2d 35, 38 (Mo.App.1987); State v. Cain, 223 Conn. 731, 733, 613 A.2d 804 (1992).
Indeed, a Michigan court has held that the fact that the release of the 911 tapes might have a chilling effect on a citizen's willingness to use the 911 system is an insufficient reason to deny access to the tapes under the Michigan Freedom of Information Act. Payne v. Grand Rapids Police Chief, 178 Mich.App. 193, 443 N.W.2d 481 (Mich.App.1989). In that case, parents suspected foul play when police ruled their daughter's death a suicide. They sought access to the 911 tapes, believing that their daughter might have called for help. The trial court refused to order release of the tapes fearing that citizens might be unwilling to report possible criminal conduct out of concern for loss of anonymity. The appellate court disagreed, and although it refused to adopt a per se rule regarding the status of 911 tapes as public records, it declared that the threat to potential use of the system was inadequate to block disclosure. Id. at 200-201, 443 N.W.2d 481.
In this case, the media has already reported the circumstances relating to the arrest and investigation. Much of that reporting was based on information which the Prosecutor disclosed. Included in the Prosecutor's statement are references to the contents of the 911 tapes.[4] Is there any real expectation of privacy in this context?
Again, no New Jersey decision has addressed this precise issue. In North Jersey Newspapers Co. v. Passaic County Bd. of Chosen Freeholders, 127 N.J. 9, 601 A.2d 693 (1992), our Supreme Court found that the Right to Know Law did not require the release of telephone records of public officials due to the expectation of privacy in telephone communications. The Court concluded that the public need for the records did not outweigh the privacy interests involved. Id. at 19, 601 A.2d 693. However, it is doubtful that the same expectation of privacy is present when a 911 call is made. Indeed, it is more likely that the average person assumes that a tape is being made of the call. State ex rel. Cincinnati Enquirer v. Hamilton Cty., 75 Ohio St.3d 374, 662 N.E.2d 334 (1996) (finding an expectation that information provided during a 911 call will be recorded and disclosed to public). Certainly, the victim here would likely hope that his calls were recorded and that they would provide evidence of his alleged mistreatment.
Furthermore, the possible negative effects of disclosure to the public are slim, when weighed against the vindication of the public policy underlying the Right to Know Law. The argument that potential jurors in the criminal prosecution of the police officers may be tainted by releasing the tapes are overstated and not supported by our case law.
In light of the Prosecutor's public statement, prospective jurors who have been exposed to the media may already know about the tapes and some of what is contained in them. They may even have *1188 made some assumptions based on the media reports about the incident. Jurors are exposed to pretrial publicity on a regular basis. To remedy this situation and to ensure the right to an impartial jury, a comprehensive voir dire is required to establish that potential jurors are able to set aside any knowledge of the incident or any opinion they have formed and render an unbiased decision. State v. Timmendequas, 161 N.J. 515, 567, 737 A.2d 55 (1999) (citing State v. Williams, 113 N.J. 393, 429, 550 A.2d 1172 (1988) (Williams II)). The Timmendequas Court held that the right to a fair trial does not mean that the jurors must be completely ignorant of the facts and issues in a case. Ibid.
The pretrial publicity which disclosure of the tapes might generate is quite unlikely to be of the magnitude that was involved in Timmendequas and Williams and yet, juries were successfully impaneled in those cases. Our courts have said that parties involved in criminal proceedings tend to overestimate the reach of publicity. United States v. Pageau, 535 F.Supp. 1031, 1033 (N.D.N.Y.1982); United States v. Haldeman, 559 F.2d 31, 62-63 n. 37(D.C.Cir.1976). The court suspects that is occurring here particularly in light of the information already released to the public. In the remote chance that any prejudice can be demonstrated from the disclosure of the tapes, there is relief available through many devices such as augmenting the jury pool, use of so-called foreign jurors or even a change of venue. In any event, mere speculation and unease concerning the release of the tapes at this posture of the proceeding should not undermine the public's right to know.
Finally, the Attorney General claims that even if the tapes are to be released under the Right to Know Law, the plaintiff is only entitled to transcripts of the tapes, not the tapes themselves or copies of the tapes. The argument is based upon a literal reading of N.J.S.A. 47:1A-2 and 2.1. It is suggested that section 2 of the Right to Know Law speaks only to written documents and does not contemplate records in other formats. Section 2.1 was adopted as an amendment to section 2 and relates to records created by data processing or imaging. It provides that a citizen shall be entitled to receive printed copies of the records, if they are to be released, rather than duplicates of the computer data or imaging. The Attorney General asserts that the Supreme Court in Higg-A-Rella, Inc. v. County of Essex, 141 N.J. 35, 660 A.2d 1163 (1995), held that the amendment of section 2 shows the legislative intent to circumscribe access to computer records sought under the Right to Know Law. However, while it is true that the Court did not order release of computer tapes under the statutory Right to Know Law, it stated that it would not extend the presumed legislative intent to computer records accessible under the common law. Therefore, it authorized the release of a duplicate of the computer tapes under the common law. Id. at 48, 660 A.2d 1163. In this court's view, the same result should be reached with the 911 tapes.
While the court finds that release of the tapes, in the context of this case, would not be inimical to the public interest, it appears that their format may preclude disclosure in tape form under the statute, in light of the Higg-A-Rella ruling. However, there is little doubt that the tapes should be disclosed under the common law right to know. Clearly they fit the definition expressed above. They are a memorial, made by a public officer, authorized by law to make them. Furthermore, an analysis *1189 of the Loigman factors leads the court to the conclusion that they should be revealed. First, as noted earlier, it is unlikely that disclosure will have a chilling effect on the likelihood that citizens will make 911 calls and, therefore, it will not impede any agency function. Second, again, the court does not believe that citizens calling 911 expect that their identities will be protected. Third, there is no evident impact on self-evaluation, program improvement or other decision-making caused by release of the tapes. Fourth, the information in the tapes is solely factual data as opposed to evaluative reports. Fifth, the tapes are part of the evidence needed to determine, in the first place, whether there has been official misconduct. Last, the plaintiff's need for release is a public need unrelated to any disciplinary or investigatory process regarding alleged police officer misconduct. In short, the balance is clearly stricken in favor of release of the tapes. The public's right to know substantially outweighs any claimed need for confidentiality.

II. The Police Reports
During oral argument, the plaintiff and the Media stipulated that the police reports were not public records under the statutory Right to Know Law. Subsequently, the Media argued that they were public records required to be maintained pursuant to N.J.S.A. 40:48-6. That statute, adopted in 1920, merely requires that when a municipality maintains a municipal building or space for the conduct of municipal business, all records should be kept there in a secure place. It is quite a leap to interpret this statute as requiring the maintenance of any records, not to mention that there is no reference therein to police records. In truth, it does nothing more than say that the records of a municipality pertaining to the operation of municipal business, if maintained at all, should be kept in a municipal building or other place of safe-keeping as designated by the governing body. The thrust of the statute is the secure storage of municipal records. Cf. Shuttleworth v. City of Camden, 258 N.J.Super. 573, 580, 610 A.2d 903 (App.Div.1992).
Clearly, the police reports are documents maintained by a political subdivision. The question is whether they are "required by law to be made, maintained or kept on file" in the words of the statute. N.J.S.A. 47:1A-2. The plaintiff is simply unable to cite the court to any authority that would satisfy that requirement. Defendants argue that even if the plaintiff could provide statutory justification for their position, the records would be exempted under Executive Order 69 excluding the release of "fingerprint cards, plates and photographs and similar criminal investigation records that are required to be made, maintained or kept by any State or local governmental agency." Executive Order No. 69, 29 N.J. Reg. 2729(a)(1977). The argument is tenuous, at best. On the face of it, the reports do not fit into the category of records protected by the Executive Order. In any event, it is clear that the records are not required to be maintained and, as such, are not public documents under the statutory Right to Know Law.[5]
*1190 The parties have stipulated that the police reports are records under the common law right to know. This court agrees. Asbury Park Press v. Seaside Heights, 246 N.J.Super. 62, 586 A.2d 870 (Law Div.1990). Thus, the citizen's right to access rests upon a personal or particular interest in the material sought. Yet, as noted, even the existence of the interest does not provide an absolute right to disclosure. Again, the Court must engage in a balancing test to determine whether the individual's right to the information outweighs the public's interest in confidentiality of the material. Nero v. Hyland, 76 N.J. 213, 222-224, 386 A.2d 846 (1978); McClain v. College Hosp., 99 N.J. 346, 354-355, 492 A.2d 991 (1985).
The records requested here consist solely of police reports concerning the chase, stop and arrest. The court has reviewed them in camera and found that they are either first person accounts of those involved in the incident or statements of other police officers who were informed of the event. Some of the reports include eyewitness statements. All of the reports contain information which could be relevant to the investigation and prosecution of the criminal charges against Jacobs and the three police officers. Indeed, they may be offered as evidence in either or both of these proceedings.
This case is a good example of the need to balance the Loigman factors, since some of them would justify the release of the reports but one of them weighs more heavily in favor of precluding disclosure. Loigman v. Kimmelman, 102 N.J. 98, 104, 505 A.2d 958 (1986). First, it is not clear whether release of the records will impede agency functions by discouraging citizens from providing information to the government. People routinely provide the police with statements at the scene of accidents, even though criminal prosecution may ensue. Whether citizens would be less likely to report incidents of police brutality out of fear of retribution is more uncertain. It should be noted that the Prosecutor's press release makes reference to the fact that the entire incident was made known to the authorities by independent witnesses to the alleged assault. The Prosecutor's disclosure was an open invitation to the media to find and interview those witnesses. In fact, the record before the court includes Press articles containing eyewitness interviews. Apparently the Prosecutor did not believe that his statement would have the potential of impairing agency functions by discouraging citizen reporting or, for that matter, encouraging the discovery of the witnesses' identities.
The second Loigman factor relates principally to those witnesses' expectation of privacy. Once again, the weight to be given to this factor is debatable for the same reasons discussed concerning the first factor. Clearly, the officers making the report cannot claim that they assumed the documents would be private. They know that the reports can be used for investigation, discipline, self-evaluation and other purposes. As to the third factor, it is difficult to argue that there would be a chilling effect on the agency in its self-evaluation or program improvement. The reports would have been made whether or not they were used for self-critical analysis. Further, the defendants stipulated they would be released in any event at the completion of the pending criminal case.
The fourth criterion mentioned in Loigman, the degree to which the information *1191 sought includes factual data as opposed to evaluative reports of policy makers, is related to the third factor. As noted, the documents before the court are nothing more than incident statements relating the maker's observation of or involvement in the affair. Since they are fact statements rather than evaluative reports, this consideration argues in favor of their release. As to the fifth factor, to this date there has been no definitive finding of public misconduct. That is at the heart of the criminal proceedings involving the three police officers. The court has not been informed of any pending disciplinary proceedings. It is likely that agency review, if any, would await the outcome of the pending criminal charges. It cannot be determined at this stage whether there was misconduct and, if so, whether remedial action was adequate.
The sixth factor, the pending investigation and criminal proceedings, bears heavily upon the outcome in this case. It is the principal basis for the defendants' argument that the reports should not be disclosed. They assert that the police reports constitute part of an ongoing investigation which will continue right up to the day of trial. Therefore, they contend the plaintiff's right to see the reports should be circumscribed so as to delay release until the trial is completed.
The defendants' argument finds support in our case law. In Shuttleworth v. City of Camden, 258 N.J.Super. 573, 610 A.2d 903 (App.Div.1992), newspapers sought to review police files and an autopsy report concerning the shooting of an arrestee who had been in police custody. The Appellate Division affirmed the trial court's decision to release the autopsy report based on the trial court's common law balancing test. Id. at 594, 610 A.2d 903.[6] The appellate court said that the "absence of any ongoing homicide investigation, and indeed precisely because the investigation was closed without the filing of charges," was a major factor in its decision to release the report. Id. at 595, 610 A.2d 903. Similarly, our Supreme Court has found that the main reason for non-disclosure is the need for confidentiality and that this concern is "especially important in the context of criminal proceedings." State v. Marshall, 148 N.J. 89, 273, 690 A.2d 1 (1997). In Keddie v. Rutgers, 148 N.J. 36, 54, 689 A.2d 702 (1997), our Court found that "the need for confidentiality is greater in pending matters than in closed cases."
The plaintiff's pursuit of the release of the tapes and records, in the public interest, relates to the potential of revealing police misconduct and, perhaps, inefficiency in the 911 system and the Lakewood Police Department. The defendants' interest in resisting disclosure is, as mentioned, its concern for the impairment of the ongoing investigation and the deleterious impact on the pending criminal proceeding. Given the importance our courts have placed on confidentiality while investigations are ongoing and criminal matters are pending, the court concludes that the Press should wait for the police reports until prosecution is completed. The trial itself could disclose a great deal of information concerning alleged police misconduct as well as alleged inadequacies or improprieties in the operation of the 911 system and the Lakewood Police Department. In the interim, the Press will have *1192 the 911 tapes to assist in its evaluation of the system. The defendants agree that they will release the reports at the completion of the criminal proceedings at which time the plaintiff can further address both the misconduct charges and the 911 system.
Finally, as noted earlier, the Legislature has adopted a comprehensive revision of the Right To Know Law most of which becomes effective July 8, 2002.[7] P.L.2001, c. 404. The new statute would not change substantially the result in this case. The revision reverses the presumption of the old statute. Under the existing law, a public record is accessible only if it is required to be made, maintained or kept on file and, even then, the release is subject to several exemptions. The amendment provides that all government records shall be subject to public access unless they are exempted from disclosure under the prior act, by any other statute, resolution of either or both houses of the Legislature, regulation promulgated under the authority of any statute, Executive Order of the Governor or under federal law (other than the Federal Freedom of Information Act). P.L.2001, c. 404, § 1.
The new law provides that criminal investigatory records shall not be considered governmental records and shall be deemed confidential. A "criminal investigatory record" is defined as a record not required by law to be made, maintained or kept on file which is held by a law enforcement agency and pertains to any criminal investigation or related civil enforcement proceedings. P.L.2001, c. 404 § 1.2. While the Act is not explicit, it seems clear that police reports would fall within this definition. However, the new legislation also declares that nothing contained therein shall be construed as in any way affecting the common law right of access to the criminal investigatory records. That leaves open the possibility that they may be released, particularly in the case of completed criminal prosecutions.
The Act provides that where a request for disclosure pertains to records involved in an investigation in progress, access can be denied if release would be inimical to the public interest provided that this exemption shall not allow a public agency to prohibit access to a record that was open for public inspection before the investigation began. Id. at § 3. That would apparently mean that most 911 tapes would be accessible under the Act since they will likely be made before any investigation is in progress. Finally, the Act directs that records maintained in a form other than writing, including those maintained electronically or by sound-recording or in a similar device, are accessible, thus resolving the issue discussed in Higg-A-Rella, 141 N.J. at 48-49, 660 A.2d 1163. P.L. 2001, c. 404. § 2. As a result, the plaintiff would be entitled to copies of the tapes both under the new Act and at common law.
Mr. Connell shall submit an order in conformity with this opinion directing release of the 911 tapes but denying disclosure of the police reports.
NOTES
[1] Since the filing of this action, Thomas F. Kelaher has become the Ocean County Prosecutor. The pleadings have not been amended but the Prosecutor's counsel has stipulated that the present Prosecutor will be bound by the result.
[2] Both the enabling statute, N.J.S.A. 52:17C-1 et seq., and the implementing administrative regulations, N.J.A.C. 17:24-1.1 et seq., utilize "9-1-1" to describe the calls made to the Public Safety Answering Point system, but they are commonly referred to as "911" calls.
[3] The Ocean County Sheriff's Office has delivered the tapes to the Ocean County Prosecutor.
[4] The Prosecutor's Press Release of August 21, 2001 says: "During [a low speed police pursuit]..., Mr. Jacobs dialed 911 reporting that he was being followed by several `kids in a van.' He made several attempts to contact authorities to request police assistance in stopping the van which was following him and a second vehicle which was also chasing him."
[5] It should be noted in passing, that under the comprehensive revision of the Right to Know Law effective July 8, 2002, there is an express provision exempting criminal investigatory reports from disclosure, which would appear to include police reports. P.L.2001, c. 404. At the end of this opinion, the court will briefly discuss what impact the new law would have on the outcome of this case.
[6] The issues concerning the disclosure of other police files were remanded to the trial court.
[7] Sections 15 and 16, relating to the Privacy Study Commission and its funding became effective immediately upon passage on January 8, 2002.