[829 NE2d 266, 796 NYS2d 302]

In the Matter of THE NEW YORK TIMES COMPANY et al., Appellants-Respondents, and CATHERINE T. REGENHARD et al., Intervenors-Appellants, v CITY OF NEW YORK FIRE DEPARTMENT, Respondent-Appellant.

Argued February 9, 2005; decided March 24, 2005

**POINTS OF COUNSEL**

*David E. McCraw*, New York City, for appellants-respondents. I. The Appellate Division erred in applying the intra-agency exemption to materials that were not part of a deliberative process. (*Matter of Russo v Nassau County Community Coll.*, 81 NY2d 690; *Matter of Gould v New York City Police Dept.*, 89 NY2d 267; *Matter of Xerox Corp. v Town of Webster*, 65 NY2d 131; *Jordan v United States Dept. of Justice*, 591 F2d 753; *Maricopa Audubon Socy. v United States Forest Serv.*, 108 F3d 1089; *Assembly of State of Cal. v United States Dept. of Commerce*, 968 F2d 916; *Vaughn v Rosen*, 523 F2d 1136; *Grand Cent. Partnership, Inc. v Cuomo*, 166 F3d 473; *Immuno AG. v Moor-Jankowski*, 77 NY2d 235.) II. Release of unredacted 911 tapes will not constitute an unwarranted invasion of personal privacy.

(*Brandes Meat Corp. v Cromer,* 146 AD2d 666; *Matter of Empire Realty Corp. v New York State Div. of Lottery,* 230 AD2d 270; *Matter of Johnson v New York City Police Dept.,* 257 AD2d 343, 94 NY2d 791; *Matter of Dobranski v Houper,* 154 AD2d 736; *Bethel v New York City Tr. Auth.,* 92 NY2d 348; *Howell v New York Post Co.,* 81 NY2d 115; *New York Times Co. v National Aeronautics & Space Admin.,* 920 F2d 1002; *Matter of New York 1 News v Office of President of Borough of Staten Is.,* 231 AD2d 524; *Matter of Newsday, Inc. v Empire State Dev. Corp.,* 98 NY2d 359; *Matter of Laureano v Grimes,* 179 AD2d 602.)

*Michael A. Cardozo, Corporation Counsel,* New York City (*John Hogrogian, Lawrence S. Kahn, Pamela Seider Dolgow* and *Marilyn Richter* of counsel), for respondent-appellant. I. As the Supreme Court and the Appellate Division correctly held, the Fire Department can properly redact the callers' words from the records of the 911 telephone calls before disclosing those records. The Fire Department did show that the personal privacy exemption under the Freedom of Information Law authorizes such redaction. (*Matter of Capital Newspapers Div. of Hearst Corp. v Burns,* 109 AD2d 92, 67 NY2d 562; *Matter of Hanig v State of N.Y. Dept. of Motor Vehs.,* 79 NY2d 106; *Matter of Empire Realty Corp. v New York State Div. of Lottery,* 230 AD2d 270; *Matter of Dobranski v Houper,* 154 AD2d 736; *Matter of Encore Coll. Bookstores v Auxiliary Serv. Corp. of State Univ. of N.Y. at Farmingdale,* 87 NY2d 410; *Matter of Fink v Lefkowitz,* 47 NY2d 567; *National Archives and Records Admin. v Favish,* 541 US 157; *New York Times Co. v National Aeronautics & Space Admin.,* 920 F2d 1002; *Matter of Scott, Sardano & Pomeranz v Records Access Officer of City of Syracuse,* 65 NY2d 294; *Matter of De Oliveira v Wagner,* 274 AD2d 904.) II. As the Supreme Court and the Appellate Division correctly held, the Fire Department can properly redact intra-agency materials from the records of the dispatch calls and of the oral histories before disclosing those records. The Fire Department did show that the intra-agency materials exemption under the Freedom of Information Law authorizes such redaction. (*Matter of Gould v New York City Police Dept.,* 89 NY2d 267; *Matter of Russo v Nassau County Community Coll.,* 81 NY2d 690; *Matter of Morgan v New York State Dept. of Envtl. Conservation,* 9 AD3d 586; *Matter of Xerox Corp. v Town of Webster,* 65 NY2d 131; *Matter of Kaufman v New York State Dept. of Envtl. Conservation,* 289 AD2d 826; *National Labor Relations Bd. v Sears, Roebuck & Co.,* 421 US 132; *Maricopa Audubon Socy. v United States Forest Serv.,* 108 F3d 1089; *Rothenberg v City Univ. of*

*N.Y.,* 191 AD2d 195, 81 NY2d 710.) III. The Appellate Division erred as a matter of law in holding that the Fire Department could not, prior to disclosure, redact from the records of the oral histories passages recounting moments of high emotion and revealing personal details. Such material comes within the exemption for personal privacy. (*Matter of Encore Coll. Bookstores v Auxiliary Serv. Corp. of State Univ. of N.Y. at Farmingdale,* 87 NY2d 410.) IV. Contrary to the holdings of the Supreme Court and the Appellate Division, the Fire Department did show that the law enforcement exemption under the Freedom of Information Law applied to the records at issue. The Fire Department compiled these records for law enforcement purposes, namely, at the request of the prosecution in the Zacarias Moussaoui criminal case. Disclosure of the records that may be offered into evidence at trial would interfere with the Moussaoui trial and endanger Moussaoui's right to a fair trial. (*John Doe Agency v John Doe Corp.,* 493 US 146.)

*Norman Siegel,* New York City, and *Kramer Levin Naftalis & Frankel LLP* (*Thomas H. Moreland, Ilyssa B. Sena* and *Jennifer Jones* of counsel) for intervenors-appellants. I. The privacy exemption does not apply to any of the materials. (*Matter of M. Farbman & Sons v New York City Health & Hosps. Corp.,* 62 NY2d 75; *Matter of Buffalo News v Buffalo Enter. Dev. Corp.,* 84 NY2d 488; *Matter of Fink v Lefkowitz,* 47 NY2d 567; *Matter of American Socy. for Prevention of Cruelty to Animals v Board of Trustees of State Univ. of N.Y.,* 147 Misc 2d 847; *Matter of Tri-State Publ. Co. v City of Port Jervis,* 138 Misc 2d 147; *National Archives and Records Admin. v Favish,* 541 US 157; *Matter of Encore Coll. Bookstores v Auxiliary Serv. Corp. of State Univ. of N.Y. at Farmingdale,* 87 NY2d 410; *Anthony v City of New York,* 339 F3d 129; *Matter of Empire Realty Corp. v New York State Div. of Lottery,* 230 AD2d 270; *Bethel v New York City Tr. Auth.,* 92 NY2d 348.) II. The Appellate Division's decision should be reversed to the extent that it held that the materials fall under the intra-agency exception. (*Matter of M. Farbman & Sons v New York City Health & Hosps. Corp.,* 62 NY2d 75; *Matter of Fink v Lefkowitz,* 47 NY2d 567; *Matter of Russo v Nassau County Community Coll.,* 81 NY2d 690; *Matter of Mothers on Move v Messer,* 236 AD2d 408; *Matter of New York 1 News v Office of President of Borough of Staten Is.,* 231 AD2d 524; *Matter of Xerox Corp. v Town of Webster,* 65 NY2d 131; *Matter of David v Lewisohn,* 142 AD2d 305; *Rothenberg v City Univ. of N.Y.,* 191 AD2d 195; *Matter of MacRae v Dolce,* 130 AD2d 577; *Matter of Johnson Newspaper Corp. v Stainkamp,* 94 AD2d 825, 61 NY2d 958.)

R.S. SMITH, J.

The issue here is whether the New York City Fire Department is required by the Freedom of Information Law (FOIL) to disclose tapes and transcripts of certain conversations that occurred on and shortly after September 11, 2001. Supreme Court and the Appellate Division held that FOIL requires disclosure of some, but not all, of the materials in dispute. We affirm most of the rulings below, but we modify the Appellate Division's order in two respects.

### Facts and Procedural History

Some four months after the September 11 attacks on the World Trade Center, Jim Dwyer, a New York Times reporter, requested "various records" from the Fire Department. In the two requests that are still disputed, he asked for:

> "All transcripts of interviews conducted by the department with members of the FDNY concerning the events of Sept. 11, 2001. (These might be called 'oral histories.') . . .

> "Any and all tapes and transcripts of any and all radio communications involving any FDNY personnel on Sept. 11, starting from 8:46 AM."

The Fire Department denied the first of the above requests, and also denied the second in large part. As a result, three categories of tapes and transcripts are now at issue. They contain: (1) calls made on September 11 to the Department's 911 emergency service; (2) calls made on the same day on the Fire Department's internal communications system, involving Department dispatchers and other employees, which are referred to as "dispatch calls"; and (3) "oral histories," consisting of interviews with firefighters in the days following September 11.

The New York Times and Dwyer brought this CPLR article 78 proceeding to compel disclosure. Later, family members of eight men who died at the World Trade Center were permitted to intervene in support of the Times's and Dwyer's position. No family member of anyone else killed in the September 11 attacks has appeared on either side.

Supreme Court ordered disclosure of tapes and transcripts containing: (1) the 911 calls, to the extent that the words recorded are those of public employees and of the eight men whose

survivors sought disclosure, but redacted to delete the words of other people who called 911; (2) the dispatch calls, redacted to delete the opinions and recommendations of Fire Department employees; and (3) the oral histories, redacted to delete opinions and recommendations and the "personal expressions of feelings" of the interviewees. The Appellate Division affirmed these rulings, except that it ordered the "personal expressions of feelings" in the oral histories disclosed. We granted both sides' motions for leave to appeal.

In this Court, the Times, Dwyer and the intervenors seek disclosure of all materials in all three categories. The Fire Department asks us to affirm the Appellate Division's order with two exceptions: It asks us to "reinstate" Supreme Court's ruling by authorizing the redaction from the oral histories of "passages recounting moments of high emotion and revealing personal details," and it asks that disclosure be denied as to six records said by the United States Department of Justice to be possible exhibits in the impending federal criminal trial of Zacarias Moussaoui, who is alleged to have had a role in the September 11 attacks.

We now affirm the Appellate Division's order with two modifications: (1) we direct that the entire oral histories be disclosed, except for specifically-identified portions that can be shown likely to cause serious pain or embarrassment to an interviewee; and (2) we direct that the Department of Justice be given a chance to demonstrate that disclosure of the six potential exhibits would interfere with the Moussaoui case, or would deprive either the United States Government or Moussaoui of a fair trial.

## Discussion

FOIL requires state and municipal agencies to "make available for public inspection and copying all records," subject to 10 exceptions (Public Officers Law § 87 [2]). Here, the Fire Department relies on three of those exceptions—the "privacy," "law enforcement" and "intra-agency" exceptions. To the extent they are relevant here, these exceptions permit agencies to

> "deny access to records or portions thereof that:
> . . .
>
> "(b) if disclosed would constitute an unwarranted invasion of personal privacy under the provisions of

subdivision two of section eighty-nine of this article;

. . .

"(e) are compiled for law enforcement purposes and which, if disclosed, would:

"i. interfere with law enforcement investigations or judicial proceedings; [or]

"ii. deprive a person of a right to a fair trial or impartial adjudication; . . .

"(g) are inter-agency or intra-agency materials which are not:

"i. *statistical or factual tabulations or data;* [or]

"ii. instructions to staff that affect the public." (*Id.*)

The Fire Department contends that the privacy exception applies to the portions of the 911 calls that are in dispute; that the intra-agency exception applies to the disputed portions of the dispatch calls; and that both these exceptions apply to portions of the oral histories. The Department also contends that the law enforcement exception applies to the six potential exhibits at the Moussaoui trial, but it does not identify those six exhibits or say which categories they belong to. Thus, we first consider the application of the privacy and intra-agency exceptions to each category of materials, and then discuss the law enforcement exception.

A. The 911 Calls

▉ The Fire Department does not now oppose disclosure of the words spoken in the 911 calls by 911 operators, or by the eight men whose families are seeking disclosure. Thus, the only issue before us is whether the disclosure of words spoken by other callers would constitute an "unwarranted invasion of personal privacy." Supreme Court and the Appellate Division both held that it would, and, in view of the extraordinary facts in this case, we agree.

We first reject the argument, advanced by the parties seeking disclosure here, that no privacy interest exists in the feelings and experiences of people no longer living. The privacy exception, it is argued, does not protect the dead, and their survivors cannot claim "privacy" for experiences and feelings that are not their own. We think this argument contradicts the common understanding of the word "privacy."

Almost everyone, surely, wants to keep from public view some aspects not only of his or her own life, but of the lives of loved

ones who have died. It is normal to be appalled if intimate moments in the life of one's deceased child, wife, husband or other close relative become publicly known, and an object of idle curiosity or a source of titillation. The desire to preserve the dignity of human existence even when life has passed is the sort of interest to which legal protection is given under the name of privacy. We thus hold that surviving relatives have an interest protected by FOIL in keeping private the affairs of the dead (*cf. National Archives and Records Admin. v Favish*, 541 US 157 [2004]).

The recognition that surviving relatives have a legally protected privacy interest, however, is only the beginning of the inquiry. We must decide whether disclosure of the tapes and transcripts of the 911 calls would injure that interest, or the comparable interest of people who called 911 and survived, and whether the injury to privacy would be "unwarranted" within the meaning of FOIL's privacy exception. Public Officers Law § 87 (2) (b), which creates the privacy exception, refers to section 89 (2), which contains a partial definition of "unwarranted invasion of personal privacy," but section 89 (2) (b) is of little help here; it says only that "[a]n unwarranted invasion of personal privacy includes, but shall not be limited to" six specific kinds of disclosure. None of the six is relevant to this case, and so we must decide whether any invasion of privacy here is "unwarranted" by balancing the privacy interests at stake against the public interest in disclosure of the information.

The privacy interests in this case are compelling. The 911 calls at issue undoubtedly contain, in many cases, the words of people confronted, without warning, with the prospect of imminent death. Those words are likely to include expressions of the terror and agony the callers felt and of their deepest feelings about what their lives and their families meant to them. The grieving family of such a caller—or the caller, if he or she survived—might reasonably be deeply offended at the idea that these words could be heard on television or read in the New York Times.

We do not imply that there is a privacy interest of comparable strength in all tapes and transcripts of calls made to 911. Two factors make the September 11 911 calls different. First, while some other 911 callers may be in as desperate straits as those who called on September 11, many are not. Secondly, the September 11 callers were part of an event that has received

and will continue to receive enormous—perhaps literally unequalled—public attention. Many millions of people have reacted, and will react, to the callers' fate with horrified fascination. Thus it is highly likely in this case—more than in almost any other imaginable—that, if the tapes and transcripts are made public, they will be replayed and republished endlessly, and that in some cases they will be exploited by media seeking to deliver sensational fare to their audience. This is the sort of invasion that the privacy exception exists to prevent.

We acknowledge that not everyone will have the same reaction to disclosure of the 911 tapes. The intervenors in this case, whose husbands and sons died at the World Trade Center, favor disclosure. They may feel, as other survivors may also, that to make their loved ones' last words public is a fitting way to allow the world to share the callers' sufferings, to admire their courage, and to be justly enraged by the crime that killed them. This normal human emotion is no less entitled to respect than a desire for privacy. Recognizing this, the Fire Department does not challenge the lower courts' rulings that the words of the eight relatives of the intervenors be disclosed, and has assured us that it will honor similar requests made in the future by the families of other September 11 callers. That commitment must be kept. Surviving callers who want disclosure are also entitled to it (Public Officers Law § 89 [2] [c] [ii]). But the privacy interests of those family members and surviving callers who do not want disclosure nevertheless remain powerful.

On the other hand, there is a legitimate public interest in the disclosure of these 911 calls. In general, it is desirable that the public know as much as possible about the terrible events of September 11. And more specifically, as the Times and Dwyer point out, the public has a legitimate interest in knowing how well or poorly the 911 system performed on that day. The National Commission on Terrorist Attacks Upon the United States, which had access to the tapes and transcripts at issue here, identified significant flaws in the system's performance (9/11 Commission Report, at 286-287, 295, 304, 318, available on the Internet at <http://www.9-11commission.gov>, cached at <http://www.courts.state.ny.us/reporter/webdocs/fullreport.pdf>), and more public scrutiny might make these problems better understood. But the parties seeking disclosure here do not request only particular calls that may be relevant to this subject; they seek complete disclosure of all the 911 calls.

We are not persuaded that such disclosure is required by the public interest. Those requesting it have not shown that the in-

formation that will be disclosed under our ruling—including the words of the 911 operators, and of callers whose survivors seek, or who themselves seek, disclosure—will be insufficient to meet the public's need to be informed. We conclude that the public interest in the words of the 911 callers is outweighed by the interest in privacy of those family members and callers who prefer that those words remain private.

B. The Dispatch Calls

■ The dispatch calls are communications within the Fire Department; the only participants in the calls were Department dispatchers and other Department employees. The tapes and transcripts of these calls are therefore "intra-agency materials," and are protected from disclosure by Public Officers Law § 87 (2) (g) unless they fit within one of two exclusions from the intra-agency exception: the exclusions for "statistical or factual tabulations or data" (§ 87 [2] [g] [i]) and for "instructions to staff that affect the public" (§ 87 [2] [g] [ii]). We interpreted the first of these exclusions in *Matter of Gould v New York City Police Dept.* (89 NY2d 267, 277 [1996]), where we said that "[f]actual data . . . simply means objective information, in contrast to opinions, ideas, or advice exchanged as part of the consultative or deliberative process of government decision making" (citations omitted). Here, Supreme Court and the Appellate Division ordered that the dispatch calls be disclosed to the extent they consist of factual statements or instructions affecting the public, but that they be redacted to eliminate nonfactual material—i.e., opinions and recommendations. This is, in our view, a straightforward and correct application of the statute as we interpreted it in *Gould*.

The parties seeking disclosure argue otherwise, relying on cases in which we have characterized the intra-agency exception as being applicable to " 'deliberative material,' i.e., communications exchanged for discussion purposes not constituting final policy decisions" (*Matter of Russo v Nassau County Community Coll.*, 81 NY2d 690, 699 [1993], citing *Matter of Xerox Corp. v Town of Webster*, 65 NY2d 131 [1985]). In *Russo* and *Xerox*, however, we were concerned with materials that were arguably not "intra-agency" at all—in *Russo*, films shown by a public college to its students, and in *Xerox*, a report prepared for a public agency by an outside consultant. In deciding that the films were not intra-agency materials, and that the report was, we relied on the facts that the films were not used by the college as part of an internal decision-making process, while the

report was used for just that purpose. Neither case implies that materials that fit squarely within the plain meaning of "intra-agency"—in this case, tapes and transcripts of internal conversations about the agency's work—are not within the scope of the intra-agency exception to FOIL.

The parties seeking disclosure also rely on our reference in *Gould* to "the consultative or deliberative process of government decision making" (81 NY2d at 277). But we used those words in *Gould* simply to define the scope of the "factual data" exclusion from the intra-agency exception; we spoke of "objective information, in contrast to" exchanges that were part of "the consultative or deliberative process." (*Id.*) *Gould* does not hold, as the parties seeking disclosure seem to suggest, that the intra-agency exception shields from disclosure only formal, lengthy or profound policy discussions.

The point of the intra-agency exception is to permit people within an agency to exchange opinions, advice and criticism freely and frankly, without the chilling prospect of public disclosure (*see Xerox*, 65 NY2d at 132, citing *Matter of Sea Crest Constr. Corp. v Stubing*, 82 AD2d 546, 549 [2d Dept 1981]). This purpose applies not only to comments made in official policy meetings and well-considered memorandums, but also to suggestions and criticisms offered with little chance for reflection in moments of crisis. A Fire Department dispatcher who believes that a rescue operation is being badly handled should feel free to say so without the concern that a tape of his or her remarks will be made public.

C. The Oral Histories

■ The record here leads us to conclude, subject to the qualification discussed below, that the oral histories are not protected from disclosure by either the privacy or the intra-agency exception. We infer from the record that the oral histories were exactly what their name implies—spoken words recorded for the benefit of posterity—and that the Department intended, and the people interviewed for these histories understood or reasonably should have understood, that the words spoken were destined for public disclosure. If this inference is correct, the privacy exception obviously has no application here. Nor does the intra-agency exception apply where, though agency employees are speaking to each other, the agency and the employees understand and intend that a tape of the conversation will be made public. The point of the intra-agency exception, as we

explained above, is to permit the internal exchange of candid advice and opinions between agency employees. The exception is not applicable to words that are intended to be passed on verbatim to the world at large.

The record evidence about the purpose and origin of the oral histories comes largely from an affidavit submitted by a representative of the Fire Department. The affidavit adopts the title "oral histories," previously used in Dwyer's request, to identify these materials, and says that after September 11 the Fire Department decided "to promptly record the recollections of Fire Department personnel who were present at the World Trade Center site on that day." These recollections, the affidavit says, were collected for two purposes: "to be an invaluable historical record, in addition to assisting in any investigations or assessments of the incident."

The Fire Department's affidavit also says that all interviewees "were assured that the interviews would be held in complete confidence." This statement, if true, would be highly relevant to this case—but it was later acknowledged to be in error. The parties stipulated that the Fire Department "has withdrawn its claim that each of these interviews ('oral histories') with Fire Dept. personnel was recorded with a promise of confidentiality to the interviewee, since it has come to the [Department's] attention that only some interviews included such a promise." After the stipulation, the Fire Department made no attempt to substantiate even the claim that "some" interviewees were promised confidentiality. The Department does not now rely on the existence of any such promise.

While the record is less clear than it might be, it establishes that the interviews were intended as an "historical record"—which implies that the interviews would be disclosed to the public. If that is the case, they should not be protected from disclosure merely because they also were, as the Fire Department says, intended to be used in "investigations or assessments." The record does not show that any interviewee was given a promise of confidentiality or led to believe that his or her words would be kept secret. Thus, the best inference is that the Department intended, and the interviewees knew or should have known, that the words spoken in the interviews would become a public record. If this is not true the burden was on the Department—which is in possession of the relevant facts—to prove otherwise (*see Matter of Newsday, Inc. v Empire State Dev. Corp.*, 98 NY2d 359, 362 [2002]; *Matter of Mantica v New*

*York State Dept. of Health*, 94 NY2d 58, 61 [1999]). The Department has not met that burden.

This logic leads to the conclusion that all of the oral histories are discloseable under FOIL. We add one qualification, however, because we are given pause by the Fire Department's insistence that "the oral histories contain numerous statements which are exceedingly personal in nature, describing the interviewees' intimate emotions such as fears, concern for themselves and loved ones, and horror at what they saw and heard." If indeed some firefighters made such statements in what they were led to believe was a private setting, it may be unfair to invade their privacy based solely on the inadequacy of the evidence the Department has submitted. We therefore direct that the Department be given an opportunity, on remand, to call to Supreme Court's attention specific portions of the oral histories which, in the Fire Department's view, would cause serious pain or embarrassment to interviewees if they were disclosed. Supreme Court should then consider, following an in camera inspection if necessary, whether those portions of the oral histories are subject to the privacy exception, taking into account any further evidence that may be submitted on the question of whether the interviewees thought the interviews were private.

D. The Law Enforcement Exception

As to the six unidentified tapes and/or transcripts which the United States Department of Justice has said it intends to use in evidence at the trial of Zacarias Moussaoui, the issue is whether they were "compiled for law enforcement purposes" and whether their disclosure would either "interfere with law enforcement investigations or judicial proceedings" or would "deprive a person of a right to a fair trial or impartial adjudication." We agree with the courts below that, on this record, there is no showing that disclosure would interfere with the Moussaoui trial or cause any unfairness.

The materials in issue are already in the Justice Department's possession, and have been made available to Moussaoui; thus their public disclosure would not give the equivalent of discovery to either side in the criminal case. Theoretically, their disclosure before Moussaoui's jury is selected might create some prejudice among potential jurors. But the items cannot, by their nature, contain anything specifically relating to Moussaoui; they relate to the September 11 events generally. Potential jurors are already exposed to an enormous mass of publicly available infor-

mation about the events of September 11—most of which obviously will not be offered in evidence at the Moussaoui trial. In this context, it is hard to see how the public disclosure of six items that the jury will see at trial anyway could have any significant effect on the federal court's ability to impanel an impartial jury.

In short, the record would justify affirming the Appellate Division's ruling that the law enforcement exception does not apply to the records in issue. Once again, however, we qualify our conclusion, because we are mindful of the enormous importance to the public interest of an orderly and fair trial for Moussaoui. The federal court has shown some concern about pretrial publicity; it has entered an order, binding on the parties to the Moussaoui case—though not, of course, on the Fire Department or the Times—prohibiting disclosure of "discovery materials" produced by the prosecutors to Moussaoui and his counsel. It may be that there is some good reason, not apparent from the record before us, why the disclosure of the six potential exhibits at issue here would create problems in the criminal case, and it can do no harm for the Department of Justice to have an opportunity to point out such a good reason to Supreme Court. If such a submission is made, Supreme Court should decide, in light of the additional information submitted and following an in camera inspection if necessary, whether the potential exhibits are subject to the law enforcement exception to FOIL.

## Conclusion

Accordingly, the order of the Appellate Division should be modified to the extent described in this opinion, and, as modified, affirmed, without costs.

ROSENBLATT, J. (dissenting in part). I disagree with the majority only with respect to the 911 calls. The Freedom of Information Law (FOIL) requires more disclosure. The public is well aware of the function of the 911 system and the sort of information it is designed to relay. Ordinarily, there is no reasonable expectation of privacy in a call to 911, and the full contents are generally subject to disclosure under FOIL.[1]

Here, because of the unique nature of the attack, the Court

---

1. Other courts considering the availability of 911 calls under FOIL have uniformly required their disclosure, and the majority appears to be in agreement in the ordinary case (*see* majority op at 484). In *State ex rel. Cincin-*

has ordered disclosure of words spoken by the operators, while deleting the words of the callers. There is, of course, a need to balance the competing public and private interests. On the side of full disclosure lies the public's interest in a complete and coherent account of what happened on September 11, 2001. FOIL's goal of making information public is inhibited when only half the conversation is divulged. The value of a response is compromised when the words that prompt the response are deleted. In some instances, the thrust of an incomplete communication can be inferred or constructed; in others it will be incoherent or even misleading.

The public interest supports disclosure broader than the Court has allowed. September 11th is a date burned in the minds of Americans, an event in which our security was profoundly violated. Precisely because of the importance of the September 11th attacks, Americans deserve to have as full an account of that event as can be responsibly furnished. Indisputably, the 911 tapes would shed light on the effectiveness of the City's disaster response. In turn, the City (and other municipalities) may adopt response plans that take into account the lessons of September 11th. This will surely save lives in the event of future disasters or emergencies. Indeed, the public report of the National Commission on Terrorist Attacks Upon the United States found various inadequacies in the City's 911 system and clearly found value in reviewing the 911 tapes (see 9/11 Commission Report, at 286-296, available on the Internet at <http://www.9-11commission.gov>, cached at <http://www.courts.state.ny.us/reporter/webdocs/fullreport.pdf>).

Balanced against disclosure is FOIL's narrow exception for an "unwarranted invasion of personal privacy" (Public Officers Law § 87 [2] [b]; § 89 [2] [b]). I agree with the Court that those who suffered the loss of loved ones could be traumatized by the disclosure of tapes that identify victims and contain dramatic, highly personal utterances different from ordinary 911 calls. Not every call, however, falls into that category. But for their connection with September 11th, many of the calls in question

---

*nati Enquirer v Hamilton County* (75 Ohio St 3d 374, 377-378, 662 NE2d 334, 337 [1996]), the Ohio Supreme Court held that there was no expectation of privacy in a 911 call and, accordingly, ordered the release of 911 tapes under that state's version of FOIL. It further held that the tapes became public records at the moment they were made and that their content was irrelevant (see 75 Ohio St 3d at 378, 662 NE2d at 337). In accord are *Meredith Corp. v City of Flint* (256 Mich App 703, 708-709, 671 NW2d 101, 104-105 [2003]), *Asbury Park Press v Lakewood Twp. Police Dept.* (354 NJ Super 146, 161, 804 A2d 1178, 1187 [Ocean County 2002]) and *Brazas v Ramsey* (291 Ill App 3d 104, 106-107, 682 NE2d 476, 477-478 [2d Dist 1997], *appeal denied* 174 Ill 2d 555, 686 NE2d 1158 [1997]).

are ordinary 911 calls: people reporting factual information and seeking help.[2] Notably, the City has not provided any affidavits from survivors or victims' family members suggesting that disclosure of 911 tapes, or any other material sought, would violate their privacy. The record contains only the opposite: affidavits from nine intervenors, family members who want full disclosure. Nevertheless, I do not challenge the majority's assumption that full disclosure would cause considerable anguish to many victims' families.

Even so, the goals of privacy and openness can both be met by additional, limited disclosure. I would expand the majority's ruling and release a written transcript of the callers' side of the 911 conversations.[3] The City could redact everything that would identify nonofficial callers in calls that have some unusually personal component, such as an expression of dying wishes to be relayed to family members, as opposed to the ordinary reporting of crime scene facts. With such calls, the City should, however, be allowed to withhold any utterance that would by name or other means identify the caller. The public interest would be served by meaningful disclosure, while the grieving families and friends of the callers would be spared the agony of having their personal lives and emotions thrust into the public realm.

My final thought relates to the performance of the firefighters, police officers and others who spearheaded the rescue efforts. It may well be that the 911 transcripts reveal imperfections or mistakes amid the chaos. This, however, is no reason to withhold the transcripts. On the contrary, they will give the public the clearest picture of how the first responders reacted, and that picture should be as comprehensive as possible. The revelation of any deficiencies on the part of the departments or their personnel is essential to improving and enhancing lifesaving procedures. Of course, no one can rightly expect perfection and exquisite orderliness in the face of an attack as horrific as this one. Exposing mistakes may prove discomforting, but this

---

**2.** The 9/11 Commission, for instance, cites the testimony of a person who called 911 from the 31st floor of the South Tower and complained that he had been put on hold multiple times before deciding on his own to flee the building (*see* 9/11 Commission Report, *supra*, at 295).

**3.** *See generally New York Times Co. v National Aeronautics & Space Admin.*, 920 F2d 1002 (DC Cir 1990) (where the majority remanded for a balancing test to determine whether a complete transcript or tapes must be disclosed under the federal Freedom of Information Act [5 USC § 552]).

will pale in the face of the unforgettable heroics that we will always associate with September 11th. For every person critical of an error or omission, ten thousand voices will rise up in praise of the firefighters, police officers and others who risked life and limb in the line of duty.

Judges G.B. SMITH, GRAFFEO and READ concur with Judge R.S. SMITH; Judge ROSENBLATT dissents in part in a separate opinion in which Chief Judge KAYE and Judge CIPARICK concur.

Order modified, without costs, by remitting to Supreme Court, New York County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.