817 A.2d 1004 (2003)
358 N.J. Super. 352
Kenneth M. SERRANO, Petitioner-Respondent,
v.
SOUTH BRUNSWICK TOWNSHIP, Respondent-Appellant,
MIDDLESEX COUNTY PROSECUTOR'S OFFICE, Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 11, 2003.
Decided March 19, 2003.
*1005 William F. Lamb, First Assistant Prosecutor of Middlesex County, argued the cause for appellant in A-2708-02T5, Middlesex County Prosecutor's Office (Bruce J. Kaplan, Middlesex County Prosecutor, attorney; Mr. Lamb of counsel and on the brief).
Donald J. Sears, North Brunswick, argued the cause for appellant in A-3110-02T5, South Brunswick Township (Busch and Busch, attorneys; Mr. Sears, of counsel and on the brief).
Thomas J. Cafferty argued the cause for respondent Kenneth M. Serrano (McGimpsey & Cafferty, attorneys; Mr. Cafferty of counsel and, with Arlene M. Turinchak, on the brief). Barbara Conklin, Deputy Attorney General, argued the cause for respondent New Jersey Government Records Council (Peter C. Harvey, Acting Attorney General of New Jersey, attorney); Patrick DeAlmeida, Deputy Attorney General, of counsel (Ms. Conklin *1006 and Doreen Piligian, Deputy Attorney General, on the brief).
Before Judges STERN, COBURN, and ALLEY.
The opinion of the court was delivered by ALLEY, J.A.D.
We consolidate these appeals for purposes of this opinion. The appeals are from a final agency determination by the Government Records Council (GRC), which was created to carry out the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13. The GRC decision overturns a decision by South Brunswick Township (the Township) and provides a newspaper reporter, Kenneth Serrano, with access to a tape of a 911 call made by a defendant in an ongoing murder prosecution a few hours prior to the alleged homicide for which the defendant has been indicted. The agency's decision would compel the current custodian of the tape, the Prosecutor of Middlesex County (prosecutor), to provide the Township with sufficient access to accommodate Serrano's request. The Township also has the means of reproducing the 911 call independent of the tape taken by the prosecutor. The prosecutor and the Township have appealed this final agency decision to us after being denied a protective order in the Law Division. They sought a stay of the GRC order from us on an emergent basis, and pending our determination of these appeals the GRC has agreed to forego enforcement or implementation of its decision.

I
The backdrop of these proceedings includes a pending homicide prosecution in Middlesex County, State v. Michael Janicki, Indictment No. 02-08-00978. The indictment charges Janicki with, among other things, stabbing his father, Ortwin Janicki, to death while the father slept in their South Brunswick home.
An investigation by the prosecutor's office and Township police alleges the following sequence of events: At about 11:15 p.m., July 16, 2002, Michael Janicki dialed 911 from his home and reached South Brunswick Police headquarters. Police and emergency medical service (EMS) units responded to Janicki's call, but he declined their assistance when they arrived at his home. At 2:15 a.m. on July 17, 2002, Janicki, it is alleged, stabbed his father. His mother, Cheryl Janicki, immediately placed a 911 call. Police officers from the Township arrived at the Janicki home ten minutes later, beginning the criminal investigation. At 3:20 a.m., investigators from the prosecutor's office arrived at the scene and took control of the investigation. By 3:00 p.m. defendant was found in Plainsboro, taken into custody, and later that day, charged with murder.
The crime and the criminal proceedings have been covered extensively in the media, particularly by the Home News Tribune. Janicki's then counsel allegedly revealed to the public that he had placed a 911 call in the hours before the crime. On or about July 23, 2002, after that disclosure, Kenneth Serrano, a reporter with the Home News Tribune, filed a request with South Brunswick Township under OPRA seeking three items: (a) an audiotape of Janicki's telephone call to 911 on July 16, 2002; (b) police reports regarding that call; and (c) EMS records concerning that call. Township officials brought the request to the attention of First Assistant Middlesex County Prosecutor William Lamb and denied the request on July 24, 2002, referring to Lamb's reliance on a "[p]ending investigation." In late August Serrano sought review of the Township's *1007 denial by filing a complaint with the newly created GRC.
A Preliminary Finding of the GRC's Acting Executive Director, dated November 27, 2002, characterized the police reports as confidential because they qualified as "criminal investigatory records" under N.J.S.A. 47:1A-1.1. These initial findings recommended, however, that the GRC find the 911 tape to be "publicly accessible in the absence of any facts that the release of this information meets the criteria in the N.J.S.A. 47:1A-3(b) for withholding records involved in an on-going criminal investigation." This report also noted the GRC had not received an explanation as to why release of the tape "would `jeopardize' an investigation in progress or be `otherwise inappropriate to release'" under N.J.S.A. 47:1a-3(b).
The prosecutor responded to the GRC in a December 4, 2002 letter. He took the position that Rule of Professional Conduct (RPC) 3.6 prohibited his office from making public any information about the identity or nature of physical evidence expected to be presented at trial and cited a 1992 directive on this point from Chief Justice Robert N. Wilentz. The prosecutor asserted that public release of the tape would "jeopardize[] the right to a fair trial" and would be "grossly inappropriate," considering that the "Janicki defense had interposed an insanity/diminished capacity defense" and that he anticipated Janicki's mental state would be "the outcome determinative issue in the case." He contended release of the tape might make it impossible to find a jury in Middlesex County and might draw a defense motion for change of venue. Further, he argued that a GRC directive to release the tape "would directly interfere with judicial prerogatives[]" usurping the role of criminal court judges as "sole arbiters of controversies regarding access to discovery material," citing R. 3:13-3 and Winberry v. Salisbury, 5 N.J. 240, 74 A.2d 406, cert. denied, 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 638 (1950). Finally, he objected that the GRC proceedings failed to name as parties the prosecutor, defense counsel, and the trial judge.
A letter submitted to the GRC on behalf of the Township noted the tape had been taken by the prosecutor on July 25 and at that time the prosecutor ordered the Township not to release a copy to anyone. The Township relied on the letter by the prosecutor and stated that, being subordinate to the County, the Township must comply with the position of the prosecutor because he is the "foremost representative of the Executive Branch of government in law enforcement in his county."
The GRC's Acting Executive Director prepared a document entitled "Finding and Recommendation" dated December 6, 2002. This document recommended that the GRC find the 911 tape to be "not publicly accessible" because he had determined that "the County Prosecutor has provided sufficient evidence for the Council to conclude that the content of the tape meets the criteria in N.J.S.A. 47:1A-3(b) for withholding records involved in an on-going criminal investigation."
Counsel for Serrano and the Home News Tribune then submitted a letter dated December 11, 2002, to the GRC, whose arguments included the contention that because 911 tapes must be kept by law they do not qualify as "criminal investigatory records" as defined in N.J.S.A. 47:1A-1.1. Thus, Serrano asserted that 911 tapes should not be covered by the confidentiality accorded criminal investigatory records during ongoing criminal investigations.
Next, the GRC's Acting Executive Director issued a "Draft Amended Finding and Recommendation" dated January 8, 2003. Here, he concluded the tape must be handed over because it was "`open for *1008 public inspection, examination or copying' before the Prosecutor or the Police commenced investigation in this matter." Given this conclusion, according to the GRC, the tape constituted a public record which was not protected as a criminal investigatory record.
A related proceeding thereafter took place before Judge Frederick DeVesa in Middlesex County, on short notice on January 15, prior to the January 17 meeting of the GRC at which the matter was to be considered. The prosecutor sought a protective order against disclosure of the tape under State v. Williams, 93 N.J. 39, 459 A.2d 641 (1983), and Judge DeVesa heard argument on behalf of the prosecutor, the Home News Tribune, and defendant Janicki. The GRC did not participate. The judge listened to the tape in camera and requested, through the parties, that the GRC allow him time to research and to prepare his decision. The GRC did not accede to the judge's suggestion that additional time would be appropriate. Judge DeVesa denied the protective order, placing the reasons for his decision in an oral opinion and issuing an order in State v. Janicki on January 16, 2003.
In his decision, Judge DeVesa stated that he gave "due deference" to the decision by Janicki's defense counsel not to oppose release of the tape. According to the prosecutor, Janicki did not oppose release of the tape to the media for "strategic reasons." Janicki's current defense counsel, William Fetky, gave notice he intended to use an insanity/diminished capacity defense, and the prosecutor alleges that the content of the tape lies "[a]t the heart of" that defense. Materials submitted by Fetky refer to the content of the call, and Fetky stated before Judge DeVesa:
I think if I oppose the release of that tape ... [i]t's going to appear that Defense Counsel and/or Michael Janicki is trying to hide something. That is the last thing in the world that I want to do. Because, quite frankly, Judge, I have listened to the tape. I have listened to the tape on several occasions. I think the tape bolsters my expert's opinion that Michael Janicki is suffering from the serious mental illness of schizophrenia.
The judge denied the protective order, determining that R. 3:13-3, a rule governing discovery, did not allow a criminal judge to take extraordinary action such as issuing such an order unless there was a necessity "to protect the rights of a defendant, particularly to a fair trial[.]" He concluded there was no such need on these facts where the tape was not "so prejudicial to either the State or the defendant, that it would directly and clearly threaten the right of a fair trial by either" and the tape was "highly likely" to be admitted into evidence at trial.[1] On these facts, Judge DeVesa determined that the potential for prejudice was effectively limited to the potential to taint a juror or jury, and he concluded "fair and impartial jurors" would be available even if the tape were released and that the criminal process would be adequate to remedy any damage done by release of the tape. He also concluded that if the prosecutor were accused of acting unethically by complying with an order by the GRC, the application for a protective order should exonerate him.
Judge DeVesa commented, however, on "very serious concerns" he hoped the GRC would address. He questioned the authority of the GRC to order release of evidentiary *1009 materials from the police or prosecutor during the pendency of a trial. He questioned the GRC's authority to order disclosure by a constitutional officer such as the prosecutor where that officer was not a party to the proceedings before the GRC. He questioned whether, given that 911 tapes "have never been required to be permanently kept," the Legislature intended 911 tapes to be considered government records, thus "open to public access and inspection under all circumstances." Finally, he concluded that the tape had never been "open to public inspection" because it was made after business hours and immediately obtained in an ongoing criminal investigation.
Because Judge DeVesa determined that these concerns were "not really satisfactorily addressed" in the preliminary findings by the GRC director, he ordered that a transcript of his decision be generated and submitted to the GRC for consideration. The prosecutor obtained this transcript in New Brunswick when available at 9:30 a.m. on January 17, and a member of the GRC staff indicated the transcript would be considered if received in Trenton by 10:30 a.m. The transcript was faxed and driven to the GRC.
In a written "Final Decision" of January 17, 2003, the GRC (1) dismissed the portion of the complaint seeking police and EMS reports; (2) found the audiotape of Janicki's 911 telephone call to be a "government record to which the requester shall be provided access;" and (3) directed the prosecutor to "provide the Township Clerk with `sufficient access' to the audiotape to allow the Township Clerk to fulfill the request for access to the audiotape." The decision stated any application for a stay must be filed with the GRC by the decision's effective date, January 31, 2003.
On January 30, 2003, the prosecutor filed with our Clerk a notice of appeal from the GRC final decision and order. Although the prosecutor asserted that R. 2:4-1(b) allowed him "45 days from the date of service of the decision" to institute appellate review, or until March 12, 2003, he pointed out the GRC extended the deadline for disclosure of the tape until only February 13, 2003, to allow consideration at the GRC public meeting scheduled for that date.
In an order dated February 13, the GRC denied the requested stay by a unanimous vote of the four members present. The GRC based its denial on the determination "there was little likelihood of success on the appeal;" the statutory mandate to interpret OPRA in favor of the public right to access (N.J.S.A. 47:1A-1); and Judge DeVesa's ruling that release of the tape would not jeopardize defendant Janicki's right to a fair trial. The GRC gave the prosecutor until February 20 to seek a stay of its decision from us stating:
the Final Decision of January 17, 2003 was AMENDED to require access to the tape be provided the Complainant no later than February 20, 2003 in order to provide the Prosecutor time to a[sic] request a stay from the Appellate Division.
After the prosecutor filed an application for emergent relief from this Court, seeking a stay based on the claim that "[c]ompliance with the GRC order and disclosure of the Janicki tape to the Home News Tribune renders moot the [prosecutor's] statutory right under N.J.S.A. 47-1a7e [sic] to seek to have that decision overturned by the Appellate Division," the parties stipulated by letter dated February 20, 2003 that the 911 tapes would not have to be released until we decided the application for a stay.
We note that a brief was filed in this matter on behalf of the GRC by the Attorney General, and that in response to our *1010 invitation to appear amicus the Division of Criminal Justice has represented to the court that it does not take a position and deems the brief by the Attorney General to articulate the position of the Attorney General only in its role as counsel to the GRC.

II
We emphasize that our disposition is based on the particular circumstances with which we are confronted, including the characteristics of the 911 call involved in this case, and in particular the caller's express lack of objection to the disclosure. We do not predict what disposition may be appropriate in other cases involving 911 tapes. The tape was made available to us in camera and we have considered its contents in connection with our determination of these appeals. While we do not divulge what the tape contains, we can summarize what it does not contain. It does not contain any admissions or statements concerning the homicide, which at the time had not occurred. It does not contain any threats of violence against any person. It does not include any mention of the eventual victim of the homicide. Its sole potential evidential use that we can foresee is with respect to the mental state of a homicide defendant a few hours before the crime.

III
We thus review the final determination of the GRC and conclude that the determination that this tape should be available for review by the public is correct. Our review is subject of course to the principle that we review final agency decisions with deference and that we will not ordinarily overturn such determinations unless they were arbitrary, capricious or unreasonable, or violated legislative policies expressed or implied in the act governing the agency. Campbell v. Dep't of Civil Service, 39 N.J. 556, 562, 189 A.2d 712 (1963).
Appellants contend the GRC erroneously interpreted OPRA, alleging the GRC employed "hyper-technical" statutory construction and disregarded an alleged legislative intent to exclude from OPRA 911 calls which set a criminal investigation in motion and 911 calls which are "closely contemporaneous" to a crime and which "bear[] vital evidentiary significance to that investigation."
OPRA, codified at N.J.S.A. 47:1A-1 to -13, replaced the Right to Know Act of 1963, N.J.S.A. 47:1A-1 to -4, and became effective July 7, 2002, little more than a week before the subject 911 call. OPRA built on the State's longstanding public policy favoring ready access to most public records. The interpretive context of the statutory provisions we must construe in the course of this opinion is in no way murky, for in the statute itself the Legislature has provided, with respect to the public's right of access:
government records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions, for the protection of the public interest, and any limitations on the right of access accorded by P.L. 1963, c. 73 (C.47:1A-1 et seq.) as amended and supplemented, shall be construed in favor of the public's right of access[.]

[N.J.S.A. 47:1A-1.]
This declaration is fully consistent with the approach under prior law, as to which our Supreme Court stated in South Jersey Pub. Co. v. New Jersey Expressway Auth., 124 N.J. 478, 496, 591 A.2d 921 (1991), that "a court should construe narrowly any possible exceptions to the Right to Know Law." The historical setting was described by the Court as follows:

*1011 New Jersey has a history of commitment to public participation in government and to the corresponding need for an informed citizenry. The New Jersey courts have long recognized a limited common-law right to inspect governmental records. See, e.g., Ferry v. Williams, 41 N.J.L. 332 (Sup.Ct.1879) (court recognized common-law right of discovery of public documents); Casey v. MacPhail, 2 N.J.Super. 619, 65 A.2d 657 (Law Div.1949) (citizen taxpayer granted access to voter registration lists). The Open Public Meetings Act, N.J.S.A. 10:4-6 to -21, and the Right to Know Law, N.J.S.A. 47:1A-1 to -4, also reflect that tradition favoring the public's right to be informed about governmental actions.

[124 N.J. at 486-87, 591 A.2d 921.]
In its analysis in South Jersey Pub. Co., the Court quoted the following passage written by James Madison:
A popular Government without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or perhaps both. Knowledge will forever govern ignorance. And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives.
[124 N.J. at 491-92, 591 A.2d 921 quoting a letter to W.T. Barry, Aug. 4, 1822, in 9 Writings of James Madison 103 (G. Hunt ed.1910).]
See also Polillo v. Deane, 74 N.J. 562, 570-71, 379 A.2d 211 (1977) (giving the background of the Open Public Meetings or Sunshine Act of 1975, N.J.S.A. 10:4-6 et seq. and the former Right to Know Law of 1960, N.J.S.A. 10: 4-1 et seq.).
Litigation over access to law enforcement information as alleged public records has been the subject of extensive judicial consideration both under prior statutes and under the common law. See, for example, Shuttleworth v. City of Camden, 258 N.J.Super. 573, 610 A.2d 903 (App. Div.), certif. denied, 133 N.J. 429, 627 A.2d 1135 (1992). We are called upon in these appeals, however, to interpret a statute that at the time of the decision appealed from had been in effect for little more than half a year.
We first consider whether the 911 tape is a "government record" for purposes of OPRA. That term is defined broadly to mean:
any paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document, information stored or maintained electronically or by sound-recording or in a similar device, or any copy thereof, that has been made, maintained or kept on file in the course of his or its official business by any officer, commission, agency or authority of the State or of any political subdivision thereof, including subordinate boards thereof, or that has been received in the course of his or its official business by any such officer, commission, agency, or authority of the State or of any political subdivision thereof, including subordinate boards thereof. The term[] shall not include inter-agency or intra-agency advisory, consultative, or deliberative material.

[N.J.S.A. 47:1A-1.1.]
We note that 911 calls are required by law to be recorded by a government agency and that these tapes must be retained for "no less than 31 days." See N.J.S.A. 52:17C-1 and N.J.A.C. 17:24-2.4. From this, we conclude that the subject 911 tape comes within the definition of a government record for purposes of N.J.S.A. 47:1A-1. See also Asbury Park Press v. Lakewood Township Police Department, 354 N.J.Super. 146, 804 A.2d *1012 1178 (Law Div.2002) (construing the former Right to Know Law to determine that the tape of a 911 call constituted a public record and thus was available to the public because it did not fall into one of the exceptions articulated in the Right to Know Law.)
Asbury Park does not interpret the exact statute as is before us, but as to certain issues it provides a useful road map for the present case. The court's conclusion that 911 tapes are records required to be made by law lends support to the GRC's similar determination here. Asbury Park also is instructive about the weight that potential increased size of a jury pool or a possible change of venue should have in view of public's right to know. The evils of which the prosecutor complains in this casethat it may be difficult to choose a jury, and that the defense may move for a change of venueare precisely the types of concerns Asbury Park concluded must be subordinated to the public's right to know. The same reasoning may be applied in the present circumstances to conclude that the "mere speculation and unease concerning the release of the tapes at this posture of the proceeding should not undermine the public's right to know." Asbury Park, supra, 354 N.J.Super. at 162-63, 804 A.2d 1178.
The current statute defines at N.J.S.A. 47:1A-1.1 several categories of confidential materials not to be considered to be "government records" accessible under OPRA. One of these categories is "criminal investigatory records," which OPRA defines as "a record which is not required by law to be made, maintained or kept on file that is held by a law enforcement agency which pertains to any criminal investigation or related civil enforcement proceeding." N.J.S.A. 47:1A-1.1. Because the tape falls within the definition of a "government record" in N.J.S.A. 47:1A-1.1, and because the law requires that such tapes be made and kept, it does not qualify as a "criminal investigatory record."
The prosecutor argues that OPRA deprives the criminal court of its authority over the disposition of evidence in criminal trials. This concern is refuted, however, by the language in N.J.S.A. 47:1A-1.1 which recognizes that "information kept confidential pursuant to court order" is not made accessible by OPRA. Indeed, the GRC January 13 preliminary finding and recommendation advised that the prosecutor might seek a protective order from the court.
N.J.S.A. 47:1A-3(a) allows (but does not mandate) confidentiality of records where an "investigation in progress" causes the release of particular records to be "inimical to the public interest," but it adds the further limitation that this confidentiality does not extend to records previously "open for public inspection." That provision begins:
Notwithstanding the provisions of P.L. 1963, c. 73 (C.47:1A-1 et seq.) as amended and supplemented, where it shall appear that the record or records which are sought to be inspected, copied, or examined shall pertain to an investigation in progress by any public agency, the right of access provided for in P.L. 1963, c. 73 (C.47:1A-1 et seq.) as amended and supplemented may be denied if the inspection, copying or examination of such record or records shall be inimical to the public interest; provided, however, that this provision shall not be construed to allow any public agency to prohibit access to a record of that agency that was open for public inspection, examination, or copying before the investigation commenced.
The tape that is the subject of this appeal was created hours before the police investigation began. If it was a public record *1013 when created, then it would remain accessible to the public under N.J.S.A. 47:1A-3(a) even if its release would be inimical to the public interest.
We are unpersuaded by the prosecutor's reliance on the fortuity that the Township's offices happened to be closed at the time of the 911 call as the predicate for an argument that the tape thereby was not "open for public inspection" under N.J.S.A. 47: 1A-3(a). The term "open" refers to the record, not the office. It is thus the record, not the office, that is "open for public inspection." The place where a record could be provided might be anywhere. It is not limited to the government office where it was made, maintained, or filed or, indeed, to any government office. Furthermore, even if the prosecutor could be said to have raised an ambiguity in the statute as to whether he could so limit production of the tape, it is plain that, as we have already noted, doubts on whether a limitation to access exists must be resolved "in favor of the public's right of access[.]" N.J.S.A. 47:1A-1.
Assuming the tape was a public record when created, it did not become retroactively confidential simply because the prosecutor obtained the tape. This result is specifically decreed by the language of OPRA, N.J.S.A. 47:1A-3(a), which states that:
[w]henever a public agency, during the course of an investigation, obtains from another public agency a government record that was open for public inspection, examination or copying before the investigation commenced, the investigating agency shall provide the other agency with sufficient access to the record to allow the other agency to comply with requests made pursuant to P.L.1963, c. 73 (C.47:1A-1 et seq.).
Additionally, we note that inasmuch as it was acknowledged during oral argument before us that the Township retains the means of reproducing the contents of the tape, this record was not rendered unavailable to the public from the Township's records simply because the prosecutor obtained one copy of it.
Were we to conclude that the tape is not "open for public inspection," the prosecutor would still lose because release of the tape in this case would not be "inimical to the public interest[.]" N.J.S.A. 47:1A-3(a). This government record does not become cloaked with confidentiality simply because the prosecutor declares it so. Insofar as the public interest is concerned, and given the caller's consent, the public has a greater interest in the release of this particular tape than in its suppression. Given the stated public policy in OPRA that records should be readily accessible, a weighty concern indeed should be advanced to counterbalance that interest. The considerations raised in this case, however, such as posited difficulties of impaneling a jury and a possible change of venue, are unpersuasive. Even if they occur, they may be inconveniences to the prosecutor, but without more, that does not make the production "inimical to the public interest[.]" Our review of the tape leaves no doubt as to the clear lack of potential for prejudice to the State that could result from its release. In reaching that conclusion, we emphasize, however, the defense attorney's non-assertion of a position that release of this tape would deprive the defendant of a fair trial.
Before moving from the subject of OPRA, for the sake of completeness we mention another of its provisions, although it was not the focus of the parties' briefs in these appeals or of the GRC's final decision. We refer to the portion of the third paragraph of N.J.S.A. 47:1A-1, which, *1014 read together with the section's introductory clause, is as follows:
The Legislature finds and declares it to be the public policy of this State that... a public agency has a responsibility and an obligation to safeguard from public access a citizen's personal information with which it has been entrusted when disclosure thereof would violate the citizen's reasonable expectation of privacy[.]
Although Judge Serpentelli's opinion in Asbury Park Press v. Lakewood Township Police Department, supra, 354 N.J.Super. at 159, 804 A.2d 1178, is pre-OPRA, it is noteworthy that he discussed a privacy issue that becomes even more significant in light of this OPRA provision. He stated, for example:
The Attorney General also argues that Bowling v. Brandenburg, 37 S.W.3d 785, 788 (Ky.Ct.App.2000), supports its claim that the release of the tapes will have a chilling effect. The Kentucky Open Records Act contains a provision which exempts from disclosure a record containing "information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy." KRS 61.878(a). The release of the tape was requested by the appellant, who had allegedly made a threat to kill his wife and other family members. A family member called 911 to report the threat. The court in Bowling found that the request for the tape was made for the specific purpose of determining the identity of the caller, which was "precisely why the Act exempts calls of a personal nature... to prevent the disclosure of a 911 caller's identity." Bowling, 37 S.W.3d at 788.
In comparison to the Kentucky statute, Judge Serpentelli observed, under the New Jersey statute then in effect, "[t]here is no comparable exemption in New Jersey's Right to Know Law." Ibid. Moreover, under the facts in the Kentucky case, "[e]ven if there were such a provision, the identity of the caller in this case has been made known both by the Prosecutor and the media." Ibid.
With the enactment of OPRA, it is reasonable to anticipate that its declaration of the "public policy" respecting the "citizen's reasonable expectation of privacy" will be considered extensively by the GRC and the courts. The provision does not confront us here, however, because no privacy claim has been asserted. To the contrary, as we have already mentioned, and as the GRC stated:
It is important to note that Janicki's attorney ... was present for the [protective order] motion and has also been copied on the Director's Findings recommending release of the tape. At no point has ... [this attorney] indicated to the Prosecutor, the GRC or Judge DeVesa that his client, who made the 911 call, has any objection to release of the content of tape to the Home News Tribune.
[January 17, 2003 "Supplement to Amended Finding and Recommendation of [the Acting] Executive Director."]
In the absence of a privacy claim with respect to the subject 911 tape, we leave for other occasions interpretation of the "citizen's reasonable expectation of privacy" declared in N.J.S.A. 47:1A-1. Plainly, the issues presented on such occasions could be complex and challenging, and we recognize that they might entail a consideration and balancing of the interests, not only of those who call 911 or who utilize other police or emergency communications services, but of others who are mentioned in or affected by the calls; the adequacy and fairness of procedures that may be adopted to protect and accommodate their privacy, including with respect to issues *1015 concerning their rights to notice and a hearing before issuance of an order for the release of information; and the extent and nature of the interplay, if any, between the "citizen's reasonable expectation of privacy" and the mandate, also set forth in N.J.S.A. 47:1A-1, to "construe[] in favor of the public's right of access" any limitations in the statute on that right.

IV
We also reject the prosecutor's assertion that, given RPC 3.6(a), the GRC must defer to a prosecutor's ethical obligation to refrain from commenting upon statements made by a criminal defendant and/or the evidence to be used against the defendant. The rule provides:
A lawyer shall not make an extrajudicial statement that a reasonable lawyer would expect to be disseminated by means of a public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding.

[RPC 3.6(a).]
We conclude that the GRC decision does not compel unethical behavior on the part of the prosecutor. Under RPC 3.6(c)(2) the prosecutor, notwithstanding the other strictures in RPC 3.6(a) and (b)(1)-(5), may "state without elaboration... the information contained in a public record." Even if the Rules of Professional Conduct and the direction of the former Chief Justice did not allow the prosecutor to do so, we consider persuasive Judge DeVesa's conclusion that the prosecutor has fulfilled any ethical obligation by bringing this matter to the attention of the court. Furthermore, because the GRC is an agency created by law, obedience to its lawful directives under the statute would have the same effect. The prosecutor has been vigorous and resourceful in his contentions, and his vigor may be seen as evidence of his commitment to act ethically.

V
We note our concern over potential procedural issues presented by GRC's operations regarding this matter. These include whether proper notice and other procedural protections, such as an adequate opportunity to be heard in connection with the results of the protective order proceeding in the Law Division, were accorded the prosecutor as a clearly interested party. We do not make any determinations herein with respect to these potential issues, however. This is because the parties' ultimate positions were developed and because, based on representations to us by GRC's counsel at oral argument, we anticipate that the GRC will take prompt measures, including the adoption of appropriate regulations, designed to avoid a rush to judgment that might result in the unfortunate erroneous release of criminal investigatory records truly inimical to the public interest, and designed to provide an orderly and fair procedural setting for presentations to the GRC and for the consideration and review of the GRC's actions.

VI
We affirm in each appeal the final agency determination of the GRC. We grant the motion to supplement the record. In view of the affirmance on the merits, we deny the application for an emergent stay as moot.
Affirmed.
COBURN, J.A.D., concurring.
As Judge Alley notes in his carefully crafted and persuasive discussion of the points raised by the parties, this case does not provide the opportunity for a definitive *1016 ruling on the question of whether 911 tapes are public records under OPRA. That is so because in this case the 911 caller had himself made the existence of the call part of the public record in the pretrial proceedings of his criminal case and had expressly taken the position in these proceedings that he did not object to release of the 911 tape.
I write to emphasize that in approving publication of the tape here, where there happened to be no objection from the caller, the court is not concluding that all 911 tapes are open to the public under OPRA. Rather, we have decided only that under the circumstances of this case, the prosecutor was not entitled to withhold this 911 tape from the public.
Unlike the former Right to Know Law, L. 1963, c. 73, discussed in Asbury Park Press, supra, the present law, as Judge Alley notes, provides that "a public agency has a responsibility and an obligation to safeguard from public access a citizen's personal information with which it has been entrusted when disclosure thereof would violate the citizen's reasonable expectation of privacy." N.J.S.A. 47:1A-1. That provision is almost identical to the provision in Kentucky's older right-to-know statute considered in Bowling v. Brandenburg, 37 S.W.3d 785 (Ky.Ct.App. 2000), which expressly prohibits public access to:
Public records containing information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy[.]
[Ky.Rev.Stat. Ann. § 61.878(1)(a) (2003), quoted in Bowling, 37 S.W.3d at 786.]
Based on that provision, the Bowling court held that under its statute 911 calls were exempt from disclosure:
Releasing the tapes of 911 calls seeking police assistance, particularly in instances of domestic violence, would have a chilling effect on those who might otherwise seek assistance because they would become subject to ... retaliation, harassment, or public ridicule.
[37 S.W.3d at 788.]
In Asbury Park, supra, 354 N.J.Super. at 159-60, 804 A.2d 1178, the court declined to follow Bowling but only because our statute did not then contain the language on which the Kentucky court relied. The statute we are considering now was enacted after the Kentucky statute became law and after Bowling construed it.
The critical provision in OPRA is patterned after the Kentucky statute. "When a statute is drafted on the pattern of another jurisdiction, it is appropriate to consider interpretations in that jurisdiction." State v. Chew, 150 N.J. 30, 55, 695 A.2d 1301 (1997), cert. denied, 528 U.S. 1052, 120 S.Ct. 593, 145 L.Ed.2d 493 (1999). Indeed, if the interpretation is that of the other jurisdiction's highest court, we generally view our statute as adopting that construction. Van Horn v. William Blanchard Co., 88 N.J. 91, 97, 438 A.2d 552 (1981). Although the Bowling court was an intermediate court, at the minimum its construction has persuasive authority.
In light of Asbury Park's discussion of Bowling, I would be inclined to the view that our Legislature found Bowling's views on 911 tapes sound and worthy of adoption. Consider in that regard the following portion of Justice Pfeifer's concurring opinion in State ex rel. Cincinnati Enquirer v. Hamilton County, 75 Ohio St.3d 374, 662 N.E.2d 334 (1996), in which he explains why these highly sensitive and intensely personal requests for aid should not be considered public records:
Public records laws exist so that government may be open to the scrutiny of the *1017 citizenry. To accomplish that goal is it necessary for families to have their most tragic and personal moments broadcast for all to hear? Does personal tragedy become a public spectacle simply because a person phones the police for aid? Are the media unable to relate effectively the story of a crime or accident without playing a recording of a victim's or a witness's plea for help? Have the rights of victims become subverted by our society's seemingly boundless morbid curiosity, transforming a moment of despair into a Warholian fifteen minutes?
While the quavering voice of a four-year-old pleading with a 911 operator to make daddy stop hitting mommy may be some station manager's idea of "good television," the broadcast of that voice is not the product of good law.

[Id. at 339.]
Because of our Legislature's adoption of the language borrowed in large part from the Kentucky statute, it appears to me that both the contents of a 911 call and the caller's identity should be treated by the recipient as confidential under N.J.S.A. 47:1A-1. In this case, the caller himself, by his submissions to the court in the criminal proceedings, permitted his identity and the existence of his call to become a matter of public record. Absent such disclosure, I would expect that the GRC would deny access to 911 records, without identifying the caller, unless satisfied that the disclosure would not "violate the citizen's reasonable expectation of privacy." N.J.S.A. 47:1A-1. I find it difficult to imagine any 911 call that would not be protected for that reason.
Although 911 calls are protected by OPRA, they may be subject to examination under the common law, provided of course that the applicant can meet the common law burden of showing some personal or particular interest in the material sought. Irval Realty, Inc. v. Bd. of Pub. Util. Comm'rs, 61 N.J. 366, 372, 294 A.2d 425 (1972). A proceeding under the common law, however, would have to be instituted in court and not before the GRC.
NOTES
[1] Fetky and Lamb stated in the proceedings before Judge DeVesa that neither saw any reason to object to admission of the tape in State v. Janicki.