OPINION OF THE COURT
Kathryn E. Freed, J.
This interim order on the petition is as follows:
In December 2014, respondents New York City Police Department (hereinafter NYPD) and Commissioner William J. Brat-ton commenced a voluntary pilot program to employ body-worn cameras (hereinafter BWC) by operations order 48, under which 54 BWCs have been distributed to officers on a volunteer basis. In April 2015, Courtney Gross, a reporter for petitioner Time Warner Cable News NY1, sought access to the video recordings taken in conjunction with the program during five week-long periods pursuant to the Freedom of Information Law (hereinafter FOIL) (Public Officers Law § 84 et seq.). According to the NYPD, the request amounted to an estimated 190 hours of footage consisting of 1,576 separate interactions between the police and members of the public. The NYPD, at each stage of the review process for the request, refused to provide unedited video recordings, citing numerous exemptions, privacy concerns and the burdens associated with making necessary redactions. At one stage of administrative review, the NYPD offered to conduct review and redaction of the video footage, provided that petitioner pay $36,480 in advance to cover the costs involved. In this CPLR article 78 proceeding, petitioner seeks a judgment compelling respondents to comply with its FOIL request, without requiring it to pay for the cost of review and redaction, as well as counsel fees. Respondents submit written opposition. After oral argument, a review of the papers presented and the relevant statutes and case law, this court finds that there is a question of fact presented by the petition and orders that there be a hearing on the issue of whether complying with the request would be unduly burdensome, considering the state of the NYPD’s current technology as well as any existing software programs that could be implemented by the NYPD.
Factual and Procedural Background
Video recordings of police interactions with members of the public have been at the forefront of public debate on police officers’ use of lethal force, most notably against black men and other persons of color. Alton Sterling, Philando Castile, Tamir *659 Rice, Walter Scott, Michael Brown, Eric Garner, Kajieme Powell and others: crucial moments preceding each of their deaths at the hands of police officers were recorded on video, released to the public and subjected to widespread scrutiny. The videos sparked public debate, outrage, riots and further violence, including violence against police officers. Many individuals, for example, some of those participating in the national Black Lives Matter movement, take the position that the videos are examples of violence routinely meted out against persons of color without justification, either intentionally or as a result of subconscious racial bias that police officers are inadequately trained to overcome (or, perhaps, in some jurisdictions, is nurtured through targeted policing of communities of color). Equally relevant is the extent to which recordings may show that the actions of police are justifiable when viewed in light of their reaction to perceived imminent personal danger. Regardless of the precise conclusions that may be drawn from any particular video, it is beyond dispute that recordings of police interactions with members of the public have allowed a fuller discourse on the role of local police in the United States. In resolving this petition, this court need not decide what meaning can be gleaned from any particular video or whether society must accept a more militarized police force as an inevitability. The public discourse on those issues will continue to play out. The focus of this petition is, instead, the extent to which FOIL permits a news station to demand that the footage recorded pursuant to the NYPD’s BWC program be made available to inform that discourse.
In August 2013, the United States District Court for the Southern District of New York (Scheindlin, J.) found, after a bench trial, that the NYPD was liable for Fourth and Fourteenth Amendment violations insofar as its “practice of making stops that lack individualized reasonable suspicion ha[d] been so pervasive and persistent as to become not only a part of the NYPD’s standard operating procedure, but a fact of daily life in some New York City neighborhoods.” (Floyd v City of New York, 959 F Supp 2d 540, 660 [SD NY 2013].) The court further found that the NYPD had “violated bedrock principles of equality” by “targeting young black and Hispanic men for stops based on the alleged criminal conduct of other young black or Hispanic men.” (Id. at 664.) To remedy those unconstitutional defects, the court ordered, among other things, that the NYPD commence a BWC program. (See Floyd v City of New York, 959 *660 F Supp 2d 668, 684-686 [SD NY 2013].) The court found that BWCs were “uniquely suited to addressing the constitutional harms at issue in [that] case.” (Id. at 685.) Specifically, the court found that the recordings taken would, among other things, “alleviate some of the mistrust that ha[d] developed between the police and the black and Hispanic communities, based on the belief that stops and frisks are overwhelmingly and unjustifiably directed at members of these communities.” (Id.) The court-ordered program is set to expand to encompass the use of 1,000 BWCs sometime in 2016. (Hernandez aff.)
The instant article 78 petition does not directly concern video recordings made under the court-ordered program. Instead, it is limited to the voluntary program commenced in December 2014, prior to the development and implementation of the court-ordered BWC program. However, this court is aware that this decision could legally impact the availability of records under the court-ordered program.
According to operations order 48, which is the subject of this petition, “[t]he BWC system has proven to be an effective tool in documenting on-duty-related police activity. The BWC pilot program will be examined to determine whether it contributes to officer safety, provides evidence for criminal prosecutions, helps to resolve personnel complaints and fosters positive relations with the community.” (Exhibit A to Hernandez aff.) The order set out a series of instructions consisting of numbered steps, step “6” of which instructed officers participating in the program to turn on the cameras under specific circumstances:
“a. All enforcement encounters where there is at least reasonable suspicion the person(s) has committed, is committing or may be involved in criminal activity consistent with P.G. 212-11 ‘Stop and Frisk.’ This includes, but is not limited to, self-initiated stops and radio runs
“b. All enforcement encounters where there is reason to believe that the individual is committing a violation/petit offense for which a summons may be issued (e.g., TAB summons, ECB summons, Criminal Court summons, etc.)
“c. All vehicle stops
“d. Taking or attempting to take an individual into custody (e.g., arrests, protective custody of an emotionally disturbed person, etc.)
“e. All incidents involving the use of force
*661 “f. Any public interaction regardless of context, that escalates and becomes adversarial, so long as it is not one of the prohibited situations in step ‘8’ below.
“g. All interior vertical patrols of non-Housing Authority buildings and Housing Authority buildings conducted pursuant to P.G. 212-59, ‘Vertical Patrol’ and P.G. 212-60, ‘Interior Vertical Patrol of Housing Authority Buildings.’ The BWC must be activated upon entering the building and terminating the interior vertical patrol along with any associated police action, if any.” (Id.)
Step “7” of the order provided that participating officers could “[c]onsider activating the BWC during any activities where, in the uniformed member’s judgment, it would be beneficial to the record, so long as it [was] not one of the prohibited situations in step ‘8’ below.” (Id.) Step “8” of the order delineated the circumstances in which an officer was directed not to activate the BWC:
“a. Encounters not directly related to official activities in the proper performance of police duties
“b. Performance of non-enforcement functions or administrative duties within [an NYPD] facility
“c. Places where a reasonable expectation of privacy exists (unless taking police action outlined in step ‘6’ above), such as, but not limited to, hospital emergency rooms, locker rooms and restrooms
“d. Attendance at events covered under the ‘Handschu Guidelines’ (see P.G. 212-72 ‘Guidelines for Uniformed Members of the Service Conducting Investigations Involving Political Activities’), unless taking police action outlined in step ‘6’ above
“e. A potential witness who requests to speak to an officer confidentially or desires anonymity
“f. A victim or witness who requests to speak to an officer confidentially or desires anonymity
“g. A victim who requests that he or she not be recorded as a condition of cooperation and the interests of justice require such cooperation.” (Id.)
According to respondents, the goal of the program is “to visually and audibly record specific categories of interactions between uniformed police officers and the public, and to examine whether this project contributes to officer safety, provides evidence for criminal prosecutions, helps to resolve personnel complaints and fosters positive relations with the *662 community.” (Hernandez aff.) There are currently 54 BWCs in use under the pilot program. (Id.)
By letter dated April 10, 2015, Courtney Gross, a news reporter working for petitioner, requested “the unedited video files from the NYPD’s body camera program for the following weeks: December 5 through 12 of 2014, January 16 through 23 of 2015, February 20 through 27 of 2015, March 13 through 20th of 2015 and April 3 through 10th of 2015.” (Exhibit A to petition.) By letter dated August 4, 2015, Lieutenant Richard Mantellino, on behalf of the NYPD, responded to the request. (Exhibit C to petition.) Mantellino stated that it was
“not possible to provide [petitioner] with unedited video files because the recorded videos, which depict interactions between police officers, supervisors, and individuals who seek assistance from the police or who are the subject of a police investigation or inquiry, and . . . contain information that (i) if disclosed, would constitute an unwarranted invasion of the privacy of numerous individuals; (ii) is confidential and relatos to a criminal investigation; (iii) could endanger the life or safety of a person or persons; (iv) constitutes non-disclosable intra- or inter-agency communications; (v) if disclosed, can impair the security of the NYPD’s information technology systems; or (vi) is otherwise exempt from disclosure pursuant to statutory law.” (Id.)
Mantellino cited Public Officers Law §§ 87 (2) (a), (b), (e), (f), (g), (i) and 89 (2) in support of the denial. (Id.) Mantellino further advised Gross that the estimated cost of obtaining nonexempt footage, after review and redaction, would be approximately $36,000 and that “[processing [would] commence upon receipt of [her] remittance [of] the copying fee.” (Id.)
Thereafter, Gross appealed the determination by letter dated September 1, 2015. (Exhibit D to petition.) Gross raised several objections to the denial of the FOIL request, including that it was not sufficiently particularized and was overly broad. (Id.) Additionally, Gross objected to the proposed imposition of a $36,000 fee, arguing that such a fee poses an impermissible burden to public access to information guaranteed by FOIL. (Id.)
In response, by letter dated September 16, 2015, Records Access Appeals Officer Jonathan David, of the NYPD, denied the appeal. (Exhibit E to petition.) David stated that the proposed *663 fee was “commensurate with the breadth of the FOIL request” and “entirely consistent with the provisions of FOIL.” (Id.)[1] David further contended that there was a sufficient justification for denying outright disclosure of the unedited footage, since the denial was, in fact, not outright but merely a denial of access to unedited footage and an opportunity for petitioner to pay to have the footage reviewed and edited. (Id.) David also defended the determination that petitioner should have to pay for the necessary review and redaction of the footage, stating that it would be “an excessive and unreasonable burden not required by FOIL” for the NYPD to have to undertake the “labor-intensive process” of reviewing and editing the footage. (Id.) David estimated that the request encompassed 190 hours of footage, which would require 190 hours to review and an additional 114 hours to make necessary redactions. (Id.) He noted that the lowest-paid NYPD employee with the necessary skills to do the work is compensated at $120 per hour, yielding a total estimated cost of $36,480. (Id.) After receiving David’s letter, petitioner commenced the instant proceeding in January 2016.
Positions of the Parties
Petitioner contends that respondents cannot demand payment for review and redaction of records pursuant to FOIL. It argues that, while FOIL permits an agency to charge for the cost of reproducing a record, reviewing and editing a record prior to disclosure is not among the costs permitted to be passed onto the requester. Petitioner contends that such a rule would have a chilling effect on the public’s ability to access government records. Petitioner also argues that respondents have failed to establish that any FOIL exemptions apply to the recordings requested. It asserts that the NYPD’s position was preemptive and conclusory, essentially amounting to a generic and speculative determination that, because many of the recordings could theoretically be subject to an exemption, all of them must be. Petitioner also requests costs and attorneys’ fees.
In response, respondents assert that FOIL does not require them to undertake burdensome efforts where, as here, it cannot engage an outside professional service to help it comply *664 with the request. They claim that a FOIL request can be denied on the ground that it would be burdensome to comply therewith. Respondents further argue that, should this court determine that they must comply with the FOIL request regardless of the burdens it would place on them, they are entitled to demand payment from a requester reflecting the costs associated with making the necessary review and redaction. They contend that they may demand such payment in advance of undertaking to comply with the request. Respondents outline exemptions applicable to both a sampling of footage that they reviewed in connection with the request as well as potentially applicable to other recordings. Respondents also dispute petitioner’s entitlement to fees and costs, claiming that, even if petitioner succeeds in obtaining the requested documents, this court would have to find that respondents lacked a reasonable basis for denying access in order to award costs and fees.
In opposition to the petition, respondents submitted, among other things, the affidavit of Lori Hernandez, Lieutenant Special Assignment for the- NYPD. She averred that, in response to the petition, she reviewed a random sampling of 25 of the 1,576 total video clips encompassed by the request. (Hernandez aff.) Of the 25 interactions reviewed, the only one for which no exemption is claimed is a 37-second clip of an unlawful eviction for which the camera was shut off upon entering the premises. (Exhibit B to Hernandez aff.) One video was too dark to determine whether there needed to be redaction, and the other 23 required redaction of some or all of the video and audio in the nature of, generally, blurring faces and removing voices.
Legal Conclusions
I. Introduction
The legislative declaration section of FOIL announces New York’s public policy that
“a free society is maintained when government is responsive and responsible to the public, and when the public is aware of governmental actions. . . . [T]he public, individually and collectively and represented by a free press, should have access to the records of government in accordance with the provisions of [FOIL].” (Public Officers Law § 84.)
*665 Indeed, FOIL “proceeds under the premise that the public is vested with an inherent right to know and that official secrecy is anathematic to our form of government.” (Matter of Fink v Lefkowitz, 47 NY2d 567, 571 [1979].) This court must bear in mind that “FOIL is to be liberally construed and its exemptions narrowly interpreted so that the public is granted maximum access to the records of government.”. (Matter of Capital Newspapers, Div. of Hearst Corp. v Whalen, 69 NY2d 246, 252 [1987].) In keeping with that policy, “FOIL provides that all records of a public agency are presumptively open to public inspection and copying unless otherwise specifically exempted.” (Matter of Capital Newspapers Div. of Hearst Corp. v Burns, 67 NY2d 562, 566 [1986]; see Public Officers Law § 87 [2].) “[T]he agency seeking to prevent disclosure carries the burden of demonstrating that the requested material falls squarely within a FOIL exemption by articulating a particularized and specific justification for denying access.” (Matter of Capital Newspapers Div. of Hearst Corp. v Burns, 67 NY2d at 566; see Matter of New York State United Teachers v Brighter Choice Charter School, 15 NY3d 560, 567 [2010].) Further, “an agency responding to a demand under [FOIL] may not withhold a record solely because some of the information in that record may be exempt from disclosure. Where it can do so without unreasonable difficulty, the agency must redact the record to take out the exempt information.” (Matter of Schenectady County Socy. for the Prevention of Cruelty to Animals, Inc. v Mills, 18 NY3d 42, 45 [2011].)
II. The NYPD has established that review and redaction of the footage is necessary in order to comply with the request, based on various substantive FOIL exemptions that may apply.
The central questions presented by this petition are whether the NYPD may deny a FOIL request on the ground that it is unduly burdensome, whether the request is, as a matter of fact, unduly burdensome, and to what extent the NYPD may pass the costs of complying with the request onto petitioner. The NYPD has identified several substantive FOIL exemptions potentially applicable to the footage requested, and this court outlines the substantive exemptions not because it agrees that they apply in the abstract, but because such an outline is essential in order to evaluate the review procedure that the NYPD claims it must undertake and to ascertain whether it is reasonable. As such, the following should not be taken to constitute an advisory opinion with respect to the applicability of any particular exemption to any particular video. This court reserves the right to make specific determinations concerning individual videos if it becomes necessary to do so.
*666 A. Where the Footage Relates to a Criminal Proceeding or Traffic Infraction
Public Officers Law § 87 (2) (e) (i) exempts from disclosure records that “are compiled for law enforcement purposes and which, if disclosed, would . . . interfere with law enforcement investigations or judicial proceedings.” This provision broadly permits an agency to make “a generic determination” that disclosure of a record would interfere with a judicial proceeding against a particular individual. (Matter of Legal Aid Socy. v New York City Police Dept., 274 AD2d 207, 214-215 [1st Dept 2000], lv dismissed and denied 95 NY2d 956 [2000]; see Matter of Whitley v New York County Dist. Attorney’s Off., 101 AD3d 455, 455 [1st Dept 2012]; Matter of Pittari v Pirro, 258 AD2d 202, 206-208 [2d Dept 1999], lv denied 94 NY2d 755 [1999].) Thus, where the footage relates to an ongoing criminal investigation or judicial proceeding against an individual, such footage may be withheld. (See also Public Officers Law § 87 [2] [e] [iii].)
Where the proceedings have concluded, other exemptions apply. Under Public Officers Law § 87 (2) (a), an agency may withhold records that “are specifically exempted from disclosure by state or federal statute.” With reference to that provision, the NYPD could properly withhold any footage that depicts a police officer stopping a vehicle and issuing a traffic summons to the driver. This is so because, pursuant to CPL 160.55 (1) (c), which covers orders upon termination of criminal actions by conviction for noncriminal offenses, “all official records and papers relating to the arrest or prosecution [of a traffic infraction or other violation] shall be sealed and not made available to any person or public or private agency.” Similarly, pursuant to CPL 160.50 (1) (c), which covers orders upon termination of criminal actions in favor of the accused, “all official records and papers . . . relating to the arrest or prosecution ... on file with . . . any court, police agency, or prosecutor’s office shall be sealed.” Thus, any footage of a traffic stop that ended in a summons for a traffic violation, and which proceedings have thereafter concluded, would be exempt from disclosure regardless of the outcome. (See generally Matter of Johnson Newspaper Corp. v Stainkamp, 61 NY2d 958, 960-961 [1984].)
Sealing orders may also be issued pursuant to CPL 240.50 by a court for good cause. Additionally, pursuant to CPL 720.35, “all official records and papers . . . relating to a case involving a youth who has been adjudicated a youthful offender . . . are *667 confidential and may not be made available to any person or public or private agency.”
B. Where the Footage Pertains to an Incident That Subjects a Police Officer, Firefighter or Corrections Officer to Discipline
Pursuant to Civil Rights Law § 50-a (1),
“[a] 11 personnel records used to evaluate performance toward continued employment or promotion, under the control of any police agency or department of the state or any political subdivision thereof including authorities or agencies maintaining police forces of individuals defined as police officers in [CPL 1.20] and such personnel records under the control of a sheriffs department or a department of correction of individuals employed as correction officers and such personnel records under the control of a paid fire department or force of individuals employed as firefighters or firefighter/ paramedics and such personnel records under the control of the department of corrections and community supervision for individuals defined as peace officers pursuant to [CPL 2.10 (23) and (23-a)] and such personnel records under the control of a probation department for individuals defined as peace officers pursuant to [CPL 2.10 (24)] shall be considered confidential.”
Thus, if the footage relates to an incident that subjects an officer to discipline and has become part of that officer’s personnel record, it may be exempt from disclosure or subject to redaction. (See Matter of Prisoners’ Legal Servs. of N.Y. v New York State Dept. of Correctional Servs., 73 NY2d 26, 31 [1988]; Telesford v Patterson, 27 AD3d 328, 329-330 [1st Dept 2006].)
C. Where the Footage Depicts Domestic Violence, Individuals Involved in Family Court Proceedings or Would Otherwise Constitute an Unwarranted Invasion of Privacy
Pursuant to Civil Rights Law § 50-b (1), footage that tends to identify the victim of a sex offense would be exempt from disclosure. Further, 22 NYCRR 205.5 broadly prohibits access to Family Court records.
Under Public Officers Law § 87 (2) (b), an agency may deny access to records if disclosure “would constitute an unwarranted invasion of personal privacy” as defined by Public Officers Law § 89 (2). Where none of the specific categories enumerated in Public Officers Law § 89 (2) applies, the test for whether disclosure of a record would constitute an unwar *668 ranted invasion of personal privacy requires balancing the privacy interests implicated with the public interest in disclosure of the record. (See Matter of Harbatkin v New York, City Dept. of Records & Info. Servs., 19 NY3d 373, 379-380 [2012], cert denied 568 US —, 133 S Ct 1239 [2013]; Matter of New York Times Co. v City of N.Y. Fire Dept., 4 NY3d 477, 485-487 [2005].) It has been held that the disclosure of information regarding the victims and witnesses to crimes may, under certain circumstances, be considered an unwarranted invasion of privacy because of, among other things, the chilling effect disclosure could have on witnesses cooperating with law enforcement and the prosecution in criminal matters. (See Matter of Exoneration Initiative v New York City Police Dept., 114 AD3d 436, 439 [1st Dept 2014]; Matter of Rodriguez v Johnson, 66 AD3d 536, 536 [1st Dept 2009]; see also Matter of New York Times Co. v City of N.Y. Police Dept., 103 AD3d 405, 408 [1st Dept 2013], lv dismissed 21 NY3d 930 [2013], lv denied 22 NY3d 854 [2013].) Privacy interests may also be implicated where a witness or informant cooperates with the police under a promise of confidentiality. (See Matter of Harbatkin v New York City Dept., of Records & Info. Servs., 19 NY3d at 380-381; Matter of Johnson v New York City Police Dept., 257 AD2d 343, 347-348 [1st Dept 1999], lv dismissed 94 NY2d 791 [1999].) Personally identifiable information including home addresses and Social Security numbers may also be exempt from disclosure. (See Matter of Exoneration Initiative v New York City Police Dept., 114 AD3d at 439.) As another example, suspects in criminal investigations that have been determined to be unfounded may have a privacy interest in the records of the investigation. (See Asian Am. Legal Defense & Educ. Fund v New York City Police Dept., 41 Misc 3d 471, 479-480 [Sup Ct, NY County 2013], affd 125 AD3d 531 [1st Dept 2015], lv denied 26 NY3d 919 [2016].) This list is not meant to be exhaustive, and there are other potential situations in which an individual depicted in footage captured by BWCs would have a privacy interest sufficient to preclude disclosure.
D. Where Disclosure of the Footage Could Endanger the Life or Safety of Any Person
Pursuant to Public Officers Law § 87 (2) (f), an agency may properly withhold access to a record where its disclosure “could endanger the life or safety of any person.” In order to invoke this exemption, an agency need only show that there is a “possibility that [the] information would endanger the lives or *669 safety of individuals.” (Matter of Stronza v Hoke, 148 AD2d 900, 900-901 [3d Dept 1989], lv denied 74 NY2d 611 [1989]; see Matter of Bellamy v New York City Police Dept., 87 AD3d 874, 875 [1st Dept 2011], affd 20 NY3d 1028 [2013].) Thus, in certain circumstances, for example where footage depicts an undercover officer, disclosure of such footage in unredacted form could plausibly endanger the life or safety of the officer. (See Matter of Sanders v Bratton, 278 AD2d 10, 13 [1st Dept 2000], abrogated on other grounds by Matter of Rattley v New York City Police Dept., 96 NY2d 873 [2001].)
E. Where the Footage Depicts Intra-Agency Communications
Pursuant to Public Officers Law § 87 (2) (g), an agency may refuse to disclose records that “are inter-agency or intra-agency materials which are not . . . statistical or factual tabulations or data; . . . instructions to staff that affect the public; . . . final agency policy or determinations; [or] external audits, including but not limited to audits performed by the comptroller and the federal government.”
Thus, “[o]pinions,” “recommendations,” and other “predeci-sional material” that forms a part of the “deliberative process of the government [wherein] persons in an advisory role . . . express their opinions ... to agency decision makers” are exempt from disclosure. (Matter of Xerox Corp. v Town of Webster, 65 NY2d 131, 132 [1985]; see Matter of Burtis v New York Police Dept., 240 AD2d 259, 260 [1st Dept 1997].) The NYPD has an interest in reviewing the footage to determine whether the videos contain any discussions that could be subject to this exemption.
In sum, it can hardly be doubted that some of the footage captured by the BWCs at issue in this petition will be subject to one or more of the aforementioned FOIL exemptions, among others. Indeed, while petitioner initially sought unedited video footage, the petition clarifies that it now seeks only “all portions of the requested records that are not subject to any exemption” rather than unedited footage. (Notice of petition.) Acknowledging this inevitability, this court now turns to the central questions presented by this petition: namely, whether the NYPD must undertake the efforts necessary to review and redact the footage in order to comply with the request and, if so, whether it may pass the costs involved onto the requester.
*670 III. There is a question of fact as to whether review and redaction of the footage would be unduly burdensome.
Under Public Officers Law § 89 (3) (a),
“[a]n agency shall not deny a request on the basis that the request is voluminous or that locating or reviewing the requested records or providing the requested copies is burdensome because the agency lacks sufficient staffing or on any other basis if the agency may engage an outside professional service to provide copying, programming or other services required to provide the copy, the costs of which the agency may recover pursuant to [Public Officers Law §87 (1) (c)].”
Further, “[w]hen an agency has the ability to retrieve or extract a record or data maintained in a computer storage system with reasonable effort, it shall be required to do so.” (Public Officers Law § 89 [3] [a]; see Matter of Weslowski v Vanderhoef, 98 AD3d 1123, 1127 [2d Dept 2012], lv dismissed 20 NY3d 995 [2013]; see also Matter of Data Tree, LLC v Romaine, 9 NY3d 454, 464-465 [2007] .[2]) The statutes and case law thus require an agency relying on the volume of a request to, first, establish that the request is unduly burdensome and, second, establish' that an outside service cannot be utilized to comply with the request.
Cases on the issue of the burdens created by a request have, generally, focused more on formatting rather than redaction. In Matter of New York Comm. for Occupational Safety & Health v Bloomberg (72 AD3d 153 [1st Dept 2010]), the City of New York was faced with a FOIL request for the raw data used by the Mayor to create the 2006 annual report required by Administrative Code of the City of New York § 12-127. The *671 City contended that, in order to comply with the request for the raw data, it would have had to create an entirely new record. The Court determined that it was “unclear [based on the record before it] whether [the manipulations of the existing records required to comply with the request] f[e]ll within the realm of running programs within [already] existing software, or [within the realm of] creating new software which would not otherwise exist but for the FOIL request.” (Matter of New York Comm. for Occupational Safety & Health v Bloomberg, 72 AD3d at 162.)
In the last paragraph of the decision, the Court also recognized that the case “present [ed] a situation where the volume of records [was] undisputedly large, and those records not only need[ed] to be retrieved and reproduced from a wide variety of sources, but redacted as well.” (Id.) “Accordingly, [the Court directed that] the hearing . . . also encompass whether an undue burden would be created by requiring the City to respond to [the petitioner’s] request.” (Id.) The decretal paragraph clarified that the hearing was meant to ascertain “whether producing responsive records that are maintained in hard copy would place an undue burden on respondents,” and explicitly excluded records maintained electronically from the undue burden issue. (Id. at 163.) Similarly, in Matter of Weslowski v Vanderhoef (98 AD3d 1123, 1130 [2d Dept 2012], lv dismissed 20 NY3d 995 [2013]), the Court held that there was a question of fact as to whether the agency “ha[d] the ability to retrieve or extract the requested data with reasonable effort” (internal quotation marks omitted). This court’s reading of the applicable authorities is that, generally speaking, an agency will have a difficult time proving that disclosure of electronically stored and easily transferrable records will be unduly burdensome. Nevertheless, there does appear to be some authority for the NYPD’s position that it can deny a request based on the burdens involved in reviewing and redacting the records. (See generally Matter of Huseman v New York City Dept. of Educ., 2016 NY Slip Op 30959[U] [Sup Ct, NY County 2016].)
To establish that the request would impose an undue burden on the NYPD, it submitted the affidavits of Lori Hernandez, Lieutenant Special Assignment and an attorney, and Joseph Smith, a Lieutenant assigned to the Technical Assistance Response Unit. According to Hernandez, the review of the footage is
“greatly impeded because the pilot BWC system is an experimental system and is not linked to any of *672 the existing NYPD databases (such as NYPD’s permanent OMNIFORM system which stores complaint reports and arrest reports and indicates whether certain arrest records are sealed pursuant to the [CPL]), the Crime Information Warehouse or the 911/Sprint System.”
Hernandez noted that no attempt was made to link the systems. She continued that the videos are not “automatically labeled with any particular radio code consistent with the Sprint System which would inform the reviewer of the type of job being handled in the footage.” Hernandez averred that, where the footage showed an arrest being made, she was “required to undertake an investigation to determine whether the matter was still pending or had been concluded, and if concluded, whether it had been concluded in favor of the accused or the People.” She explained that, in order to conduct that investigation, she had to log into the OMNIFORM database and “locate the arrest report for the incident in order to determine if the arrest ha[d] been sealed.” She stated that, where the officer involved in the footage marked it with the number of the arrest report, that step was considerably easier. However, the footage of the arrest was not tagged in three of the four videos that Hernandez reviewed.
Hernandez continued that, where the video was not tagged with the arrest number, she had to “r[un] a query of all arrests for the particular date and time” to “attempt [ ] to determine which one would likely be linked to the footage based on the charges.” After running that query, she was able to determine the arrest number and view the report. According to Hernandez, of the four arrests reviewed, only one was sealed. She stated that, for the three arrests that were not sealed, she had to then determine whether there was an ongoing criminal investigation or judicial proceeding. To that end, she “queried the Webcrims website by defendant’s name which [she] obtained from the arrest report. Because the NYPD does not maintain the criminal court case numbers in OMNIFORM, a name search is necessary.”
According to Hernandez, in order to determine whether the footage depicts a complainant or witness who has provided information about a crime, it is necessary to consult OMNIFORM for a complaint report “to determine if the matter was left open for further investigation by a detective squad,” which “might also require a search of the Detective Bureau’s database to determine if an incident that had been left open is now closed.” Hernandez estimated that, in addition to the *673 amount of time required to view the full video clip, “at least an additional five to fifteen minutes for each arrest was required to determine if the footage depicts an arrest that was subsequently sealed and, if not, one in which a prosecution is currently pending.”
Hernandez stated that, although it was not necessary for the footage she reviewed,
“to determine whether footage is being used as part of an investigation being conducted by the Internal Affairs Bureau, an email would be sent to all investigative personnel in that [b]ureau to determine if there are any pending investigations concerning any incidents that occurred on the dates the footage was recorded and, if so, if any of these investigations concern any of the incidents depicted in the footage.”
She continued that, apart from the Internal Affairs Bureau, a borough inspection unit or the command to which an officer is assigned could also conduct a review. The remainder of the exemptions were, for the most part, discernible based upon a review of the footage itself without the need to consult outside databases. Hernandez estimated that it would take 220 hours to review the 1,576 video clips requested, without reference to the time required to edit the footage.
In Smith’s affidavit, he averred that the Technical Assistance Response Unit (hereinafter TARU) uses Camtasia editing software to edit video footage. He stated that, in order to begin working on a video, TARU receives the data on DVDs, the contents of which must be uploaded to the laptops used. He estimated that there would be 51 DVDs of footage involved in the instant request and, since each DVD takes 10 minutes to upload, it would take approximately 8.5 hours simply to make the footage available for editing. Smith further stated that the raw video footage must be rendered into a file format that is suitable for editing, a process which takes approximately 10 minutes per DVD. He continued that individuals in TARU are not themselves knowledgeable as to FOIL and, thus, would need to receive detailed instructions from the officers as to which individuals depicted in the videos would need to be blurred and which portions of audio should be cut.
According to Smith, while deletion on Camtasia is easy, blurring is very difficult, as the software only permits a user to blur faces that are moving one frame at a time. Smith stated that, in his estimation, “it would take 30 minutes to blur a *674 single moving image that appears on a video clip for only one minute, and to review the clip to ensure that the image is sufficiently obscured.” He explained that this process would have to be repeated for each and every face or item requiring redaction. Smith approximated that, based on those assumptions, it would take 2,858.5 hours to edit the requested footage.
Petitioner supported the pétition with, among other things, advertisements and literature from software developers that have developed products geared toward the needs of law enforcement in complying with requests such as the one at issue here. The first is for a. product called Smart Redaction by Utility, Inc. (Exhibits 8-10 to Shapiro aff.) According to the company literature, the software allows for “reliable] and efficient [ ] release [of] video for [Freedom of Information Act] requests in a fraction of the time it would take to manually redact video.” (Exhibit 8.) The software allows the user to select individual objects in a video and blur that object or blur everything except that object. This is so because the software is apparently capable of “automatically identifying] and redacting] all faces and body parts in a video, ensuring that everyone within the video is blurred, while keeping important objects and landscapes sharp,”. (Exhibit 8.) Another company, VIEVU, has also developed software that allows the user to “mark[ ] a single frame of an object, which allows the software to remove that object from the entirety of the footage.” (Exhibit 13.) Additionally, a software firm called MotionDSP has developed a product called Ikena Spotlight, which “uses proprietary object-tracking technology to help automate the process of blurring faces, license plates or any other personally identifiable information.”
In August 2015, in conjunction with the NYPD’s request for proposals relating to the BWC program, it answered various questions from potential vendors about the requirements of the program. (Exhibit 17.) One of the questions was whether there would be a need for the logical system to “provide video redaction cost reduction tools and perform video redaction before video is distributed . . . [such that] the NYPD [would] more highly rate [those vendors capable of] materially reducing] the human manual effort, cost, and delay of redacting video.” The NYPD responded that “[Redaction services [were] not a requirement or assumption of [the] solicitation.” (Id.)
At oral argument, counsel for the NYPD conceded that it neglected to update its technology during the procurement *675 process for the BWCs. (Oral argument at 18.) The NYPD essentially took the position that, having ignored the substantial likelihood that the footage captured would be subject to a FOIL request, it could deny such a request on the basis of having to rely on outdated software. That position is untenable. Any true examination of the burden of this request must take into account the costs associated with updating software in order to make redactions. The NYPD cannot intentionally fail to update its technology during the procurement process for the BWC program and simultaneously rely on outdated software as the reason to deny a FOIL request. In that same vein, it is difficult to understand why the NYPD would use DVDs to transfer files within its organizations when there are a multitude of better technologies widely available, such as USB sticks. This court also wonders what progress has been made on any attempt to link OMNIFORM, Sprint and the other police databases to the videos captured in the court-ordered BWC programs.
The NYPD has continually stressed that this BWC program is voluntary. Conspicuously absent from its papers is any information about the court-ordered BWC program and whether that program has been handled differently in the context of a FOIL request. It is not clear from the papers whether there have been any FOIL requests for footage taken pursuant to that program, and, if so, how the NYPD has responded to them. It is particularly difficult to conceive that the NYPD did not contemplate the generation of FOIL requests from the court-ordered program, since the entire focus of that program was to provide more transparency between the NYPD and the public. If the NYPD has not attempted to link the databases to either the court-ordered or the voluntary BWC program, this court also finds it relevant to know how difficult it would be to do so. The affidavits submitted by the NYPD do not explain the state of the technology used in the court-ordered BWC program.[3]
Thus, there is an issue of fact presented by the papers regarding the amount of time it should reasonably take the NYPD to review and redact the video footage. As such, a hearing shall be held forthwith on the issues of the NYPD’s current technology, the costs associated with procuring software that *676 would make performing necessary redactions possible and the extent to which that software would decrease the time required to perform the redactions. (See CPLR 7804 [h]; Matter of Weslowski v Vanderhoef, 98 AD3d at 1131-1132.)
The next question is whether the NYPD can pass the costs of reviewing and redacting the records onto the FOIL requester.
IV. The costs of review and redaction cannot be passed onto petitioner.
While an agency may pass certain costs associated with a FOIL request onto the requester, those circumstances are narrowly defined. FOIL permits agencies to charge fees for requests, “which shall not exceed twenty-five cents per photocopy ... or the actual cost of reproducing any other record.” (Public Officers Law § 87 [1] [b] [iii].) The statute further provides that
“[i]n determining the actual cost of reproducing a record, an agency may include only:
“i. an amount equal to the hourly salary attributed to the lowest paid agency employee who has the necessary skill required to prepare a copy of the requested record;
“ii. the actual cost of the storage devices or media provided to the person making the request in complying with such request;
“iii. the actual cost to the agency of engaging an outside professional service to prepare a copy of a record, but only when án agency’s information technology equipment is inadequate to prepare a copy, if such service is used to prepare the copy; and
“iv. preparing a copy shall not include search time or administrative costs, and no fee shall be charged unless at least two hours of agency employee time is needed to prepare a copy of the record requested. A person requesting a record shall be informed of the estimated cost of preparing a copy of the record if more than two hours of an agency employee’s time is needed, or if an outside professional service would be retained to prepare a copy of the record.” (Public Officers Law § 87 [1] [c].)
The Committee on Open Government has passed regulations on the issue of fees in which its view on the proper interpretation of the statute is reflected. The regulations provide, in *677 pertinent part, that “[a]n agency shall not charge a fee for . . . inspection of records for which no redaction is permitted [or] review of the content of requested records to determine the extent to which records must be disclosed or may be withheld.” (21 NYCRR 1401.8 [a].) The regulations further provide that an agency “may charge for a copy of [an electronically stored] record . . . based on the actual cost of reproduction.” (21 NYCRR 1401.8 [c].) The charge may include only
“an amount equal to the hourly salary attributed to the lowest paid employee who has the necessary skill required to prepare a copy of the requested record, but only when more than two hours of the employee’s time is necessary to do so [and] the actual cost of the storage devices or media provided to the person making the request in complying with such request.” (21 NYCRR 1401.8 [c] [1], [2].)
This court is also guided by advisory opinions issued by the Committee on Open Government. While “the advisory opinions issued by the Committee on Open Government are not binding on the courts, an agency’s interpretation of the statutes it administers generally should be upheld if not unreasonable or irrational.” (Matter of Weslowski v Vanderhoef, 98 AD3d at 1130 [internal quotation marks and citation omitted].) The Committee has opined that “once records have been ‘prepared’, no fee can be charged for the time needed to read and review them.” (Comm on Open Govt FOIL-AQ-19234 [2014].) The opinion explained that “FOIL has never authorized a fee for the time taken by an attorney, for example, or staff to read and consider the content of records that have been prepared to determine which records or portions of records are available or perhaps deniable.” (Id.) The Committee opined on another occasion that “an agency is not permitted to charge for time spent reviewing records to determine which portions, if any, may be withheld.” (Comm on Open Govt FOIL-AO-19103 [2014].) The Committee elaborated that “electronically removing material from [an electronically stored] record[ ] is the same as blacking out sentences on a page prior to copying for release, an act which [FOIL] has consistently required the agency to perform at no cost to the applicant.” (Id.) The Committee made it abundantly clear that the time associated with redactions may not be passed onto the requester — only the costs associated with preparing records into one format or another, to the extent that it takes longer than two hours to do. (Id.) Other opinions issued by the Committee support this conclusion. (See e.g. *678 Comm on Open Govt FOIL-AO-18127 [2010]; Comm on Open Govt FOIL-AO-17734 [2009].)
In the absence of any authority to the contrary, this court is persuaded by the opinions of the Committee on Open Government, and adopts the reasoning set forth in the foregoing opinions. The NYPD may not pass the costs associated with reviewing or redacting the footage requested onto petitioner.
V. The question of counsel fees is premature.
As relevant here, the court in a CPLR article 78 proceeding concerning the denial of a FOIL request “may assess, against such agency involved, reasonable attorney’s fees and other litigation costs reasonably incurred by [the petitioner] . . . [where the petitioner] has substantially prevailed, when . . . the agency had no reasonable basis for denying access.” (Public Officers Law § 89 [4] [c] [i].) In light of the necessity for a hearing to determine the issues presented by the petition, it cannot be said that petitioner has substantially prevailed at this juncture. Thus, the question of counsel fees will be addressed following the outcome of the hearing. (See generally Matter of Exoneration Initiative v New York City Police Dept., 132 AD3d 545, 547 [1st Dept 2015].)
Therefore, in accordance with the foregoing, it is hereby ordered that the petition is granted to the limited extent of directing a hearing on the issue of whether complying with the request would be unduly burdensome, considering the state of the NYPD’s current technology as well as any existing software programs that could be implemented by the NYPD.

. While the NYPD now estimates that its actual cost is $121,026, it concedes that, to the extent this court finds that it must comply with the FOIL request, it will hold itself to its original estimate. (Answer ¶¶ 78-79.)

. This statutory enactment substantially followed a decision by the Court of Appeals in which it held that
“if the records [at issue in a FOIL request] are maintained electronically by an agency and are retrievable with reasonable effort, that agency is required to disclose the information. In such a situation, the agency is merely retrieving the electronic data that it has already compiled and copying it onto another electronic medium.” (Matter of Data Tree, LLC v Romaine, 9 NY3d 454, 464-465 [2007].)
The Court continued that
“[o]n the other hand, if the agency does not maintain the records in a transferable electronic format, then the agency should not be required to create a new document to make its records transferable. A simple manipulation of the computer necessary to transfer existing records should not, if it does not involve significant time or expense, be treated as creation of a new document.” (Id. at 465.)

. This court also wonders whether the parties would agree to a compromise whereby, similar to the system utilized in Seattle, all of the footage is blurred, and petitioner could request a clearer version of particular videos it is most interested in. (Oral argument at 8-9, 19.)